986 So.2d 905 (2008)
Herbert Randall McNEILL and Rita Miller McNeill, Plaintiffs-Appellants,
v.
LANDSTAR RANGER, INC., Defendant-Appellee.
No. 43,362-CA.
Court of Appeal of Louisiana, Second Circuit.
June 11, 2008.
*908 James M. Johnson, for Appellants.
Provosty, Sadler, deLaunay, Fiorenza & Sobel, by Ronald J. Fiorenza, Jeremy C. Cedars, Alexandria, for Appellee.
Johnson, Stiltner & Rahman, by Patricia Jackson Delpit, Baton Rouge, for Intervenor, LWCC.
Before GASKINS, CARAWAY and DREW, JJ.
CARAWAY, J.
The plaintiff was injured when the back end of the forklift he operated dropped from the back of the truck he was loading and lodged on a loading dock after the truck pulled forward. A jury allocated the truck driver, the plaintiff and plaintiff's co-employee each with one-third of the fault for the accident and awarded McNeill lost income and general damages but denied consortium damages to McNeill's wife. This appeal by the McNeills ensued. We affirm.

Facts
The plaintiff, Herbert Randall McNeill, worked as a warehouse supervisor for Explo Systems, Inc. ("Explo"), at its Camp Minden facility. Explo contracted with the United States government for removal of TNT from bombs that were transported to Explo's loading docks by tractor trailer trucks. Forklifts were utilized to remove the bombs from the trucks. On the morning of July 6, 2006, McNeill performed the dual role of supervising Charlariet "Frosty" White and driving a forklift. White flagged the trucks to the unloading location on the dock.
At the time of the accident, Don Ledford, Jr., owner-operator for Landstar Ranger, Inc., positioned his truck at Explo's dock. The truck transported 26 pallets, each containing two 750 lb. bombs. Federal HazMat regulations for unloading hazardous materials require that the truck engine be turned off and the brakes set. The flagman motions the driver with a throat slashing signal which informs him to kill the engine and set the brakes. After initial compliance with these requirements, McNeill successfully unloaded approximately 22 bombs from Ledford's truck.
Before the unloading process for Ledford's truck could conclude, the temporary metal apparatus that connects the dock to the truck, referred to as the dock plate, became dislodged and inoperable. To remedy the situation, White requested that Ledford pull his truck away from the dock. After White flagged Ledford forward, the dock plate was adjusted. White then directed Ledford back to the dock and held his hand out for Ledford to stop. Ledford complied, but never killed the engine of the truck. According to Ledford's testimony, White then dropped his hands and Ledford interpreted White's movement as a signal that unloading was complete. *909 Ledford pulled the truck forward without knowing that McNeill had begun moving his forklift onto the truck to finish unloading the bombs. As Ledford pulled forward, McNeill's forklift was partially inside of the truck and partially on the dock and dock plate. The forward movement of the truck caused the dock plate to release and the forklift to drop.
The forklift came to rest lodged between the truck and the dock with the rear of the vehicle having dropped approximately 4 feet off the dock and the front wheels still in the truck's trailer. As the forklift fell, McNeill was able to grab the roll cage with his left hand and the steering wheel with his right hand. He received injuries from the downward jolt to his left arm, shoulder and back. McNeill reported to the Minden hospital on the day of the accident where he was evaluated and referred to his family physician.
Five days after the accident, McNeill saw his family physician on July 11 with complaints of back, neck and shoulder pain. His physician treated him with anti-inflammatory medication until McNeill's return to his office on July 17. Because McNeill reported a slight improvement in his condition, his physician released him to return to work which McNeill was willing to try. McNeill returned to work while under the continued care of his physician, although he did not perform at full duty.
On August 24, 2006, an explosion occurred at Explo. McNeill saw smoke coming from the third floor of the plant and yelled at White and another individual to move away from the premises. As the employees moved toward the plant gate, the building exploded and knocked McNeill off of his feet onto his left side. White assisted McNeill over a 6-ft. fence and through woods. McNeill received emergency room treatment and returned to his family physician the following day. He was unable to return to employment with Explo after the explosion.
On February 23, 2007, McNeill and his wife, Rita Miller McNeill, instituted suit against Landstar Ranger, Inc., seeking damages for the injuries he received from the July 6, 2006 accident.[1] A jury allocated fault equally (1/3 each) to Ledford (Landstar), McNeill and White and awarded $1,000 general damages and $1,000 lost income to McNeill. Rita McNeill's claim for consortium damages was rejected. The McNeills appeal the judgment contending that the fault allocation to Landstar and damage determinations are manifestly erroneous.

Discussion

I.
The trier of fact is required to compare the relative fault of the parties in assessing liability. The fault of all persons causing or contributing to the injury shall be determined. La. C.C. art. 2323. In allocating fault, the trial court must consider the nature of each party's conduct and the extent of the causal relationship between that conduct and the damages claimed. Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La.1985); Morris v. Flores, 36,932 (La.App.2d Cir.3/7/03), 840 So.2d 1257; McCullin v. U.S. Agencies Casualty Ins. Co., 34,661 (La.App.2d Cir.5/9/01), 786 So.2d 269. Factors which may influence the degree of fault assigned to each party include: (1) whether the conduct resulted from inadvertence or involved an awareness of danger; (2) how great a risk the conduct created; (3) the significance of what the *910 actors sought by the conduct; (4) the capacities of the actors, whether superior or inferior; and (5) any extenuating circumstances which might require the actors to proceed in haste, without proper forethought. Watson, supra; McCullin, supra.
The trial court's apportionment of fault is a factual determination subject to the manifest error standard of review. Williams v. City of Monroe, 27,065 (La. App.2d Cir.7/3/95), 658 So.2d 820, writs denied, 95-1998 (La.12/15/95), 664 So.2d 451, 95-2017 (La.12/15/95), 664 So.2d 452.
On appeal McNeill argues that Ledford's fault should be increased to 50% and his reduced to 25%. However, the primary question to be addressed is whether the one-third fault assessment to the judgment debtor, Landstar, is abusively low and manifestly in error. Significantly, in making this argument therefore, McNeill admits that a portion of the fault or negligence is attributable to the Explo employees regardless of the allocation between the two of them.
The accounts of the four witnesses to the accident were consistent in most regards. The men had successfully and appropriately unloaded most of the bombs from Ledford's truck without incident. When the dock plate became dislodged, Ledford was requested to move his truck forward so that McNeill could re-adjust it. Ledford was directed by White to move his truck forward and when the plate was adjusted by McNeill, White successfully directed Ledford back to the dock.
McNeill testified that he did not see White give Ledford a hand signal to move forward before the accident and that he could not see Ledford inside of the truck. McNeill did not recall whether the engine to Ledford's vehicle was turned off or whether the brakes were engaged, claiming the forklift noise drowned out any other noises. He conceded that he assumed that White had made sure that Ledford's engine was turned off.
McNeill testified that as supervisor it was his responsibility to make sure it was safe to enter Ledford's truck and to prevent accidents. His responsibilities also included training White to perform the appropriate hand signals and safety precautions relating to loading and unloading the trucks. McNeill admitted his knowledge of federal safety guidelines requiring truck engines to be turned off and the brakes engaged for unloading hazardous materials.
White testified that he signaled Ledford to move back after McNeill adjusted the dock plate. He also signaled for him to stop when the truck was re-positioned correctly for completion of the unloading. That stop signal, however, was not the "slash throat" or engine cut-off signal. White denied ever signaling Ledford to move forward after that time, although he admitted that he made no effort to insure that Ledford's brakes were set. He also was aware that the truck's motor remained running.
Ledford testified that prior to the initial unloading, he was given the slash throat signal which instructed him to kill his engine and set his brakes as required by regulations. At some point, someone asked him to move his truck forward. With hand signals,[2] White directed Ledford forward. Ledford recalled that after the dock plate was adjusted, White motioned him to back up to the dock. White *911 held out his hand to direct Ledford to stop. Ledford recalled that White then dropped his hands which he interpreted to mean that he was done and could pull forward. Ledford testified that White never gave him the signal to stop his engine or set the brakes. Admittedly, Ledford acknowledged that it was abnormal for the flagman to direct him forward and then back without signaling him to set his brakes and turn the engine off.
Fred Davis, a tractor-trailer driver, also had his truck on the lot on the day of the accident. He witnessed someone ask Ledford to move his truck forward after the initial unloading. Davis testified that Ledford's movements were being directed by a flagman. He saw White motioning for Ledford to back toward the dock. Davis testified that the last signal given was a "go-ahead," as the flagman moved his arm forward. Davis testified that White never gave Ledford the signal to stop the engine of his truck.
When we focus on these accounts of the accident, the jury's allocation of one-third of the fault to Ledford (Landstar) is not unreasonable and clearly wrong. As the flagman, White was charged with the duty of directing the truck's movement. He was in the superior position to observe and be aware of the danger since Ledford was unable to see the dock plate or the movement of the forklift and McNeill may have been hampered by the noise of the forklift. McNeill, nevertheless, was White's supervisor, and he was able to observe that the engine cut-off signal was never given to Ledford. Accordingly, the jury's assignment of two-thirds of the fault to Explo's employees, who were in a superior position to avoid the accident, will not be overturned.

II.
In a personal injury suit, the plaintiff bears the burden of proving a causal relationship between the injury sustained and the accident which caused the injury. Maranto v. Goodyear Tire & Rubber Co., 94-2603 (La.2/20/95), 650 So.2d 757; Edwards v. LCR-M Corp., Inc., 41,125 (La.App.2d Cir.7/12/06), 936 So.2d 233. Proof must be by a preponderance of the evidence. Maranto, supra. The test for determining the causal relationship is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident. Id. It is well established in our jurisprudence that a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. Touchard v. SLEMCO Electric Foundation, 99-3577 (La.10/17/00), 769 So.2d 1200. Before recovery can be granted for aggravation of a pre-existing condition, a causative link between the accident and the victim's current status must also be established. Edwards v. LCR-M Corp., supra.
General damages are those which are inherently speculative in nature and cannot be fixed with mathematical certainty, including pain and suffering. Hunt v. Safeway Ins. Co., 35,306 (La.App.2d Cir.12/5/01), 804 So.2d 724. The discretion vested in the trier of fact is great, and even vast, so that an appellate court should rarely disturb an award of general damages. La. C.C. art. 2324.1; Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Hunt, supra.
*912 Only after an abuse of discretion is disclosed by an articulated analysis of the facts is an examination of prior awards in similar cases proper; an abusively low award is raised to the lowest amount the trier of fact could have reasonably awarded, while an abusively high award is reduced to the highest amount the trier of fact could have reasonably awarded. Hunt, supra. The proper procedure for examining whether an award is excessive is to determine whether the amount can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the trier of fact. Locke v. Young, 42,703 (La.App.2d Cir.12/12/07), 973 So.2d 831; Manuel v. State Farm Mutual Automobile Ins. Co., 30,765 (La. App.2d Cir.8/19/98), 717 So.2d 277.
Damages for loss of consortium are general damages, the assessment of which the factfinder is given much discretion. La. C.C. art. 2324.1; Etheredge v. St. Paul Mercury Ins. Co., 35,832 (La. App.2d Cir.04/03/02), 814 So.2d 119. Loss of consortium has seven elements: (1) loss of love and affection; (2) loss of society and companionship; (3) impairment of sexual relations; (4) loss of performance of material services; (5) loss of financial support; (6) loss of aid and assistance; and (7) loss of fidelity. Bell v. USAA Casualty Ins. Co., 30,172 (La.App.2d Cir.01/21/98), 707 So.2d 102, writs denied, 98-0712, 98-0766 (La.05/08/98), 718 So.2d 433, 434. Proof of any one of these elements is sufficient to support an award of loss of consortium damages. Whitaker v. Mullinax, 628 So.2d 222 (La.App. 2d Cir.1993), writ denied, 94-0382 (La.03/25/94), 635 So.2d 241; Broussard v. Razden, 98-2576 (La.App. 1st Cir.12/28/99), 763 So.2d 644.
In this case, the jury awarded McNeill $1,000 general damages and denied Rita McNeill consortium damages. On appeal, McNeill argues that the damages awarded reflected the jury's determination that only one week of pain and suffering occurred.[3] He argues that the August 24 explosion aggravated pre-existing injuries caused by the forklift incident entitling him to damages for his permanent and total disability in the amount of $250,000. For the same reasons he argues that the jury should have awarded Rita McNeill $50,000 consortium damages.
The evidence presented in support of McNeill's claim for damages included the testimony of McNeill and his wife, Rita. McNeill testified that he injured his left arm, shoulder and back as the result of the forklift incident. He was immediately taken to the hospital emergency room where he underwent a CT scan and x-rays. McNeill testified that the emergency room physician instructed him to see his family physician and released him on the day of the accident.
McNeill saw Dr. Carl Hines on July 11, 2006, and was treated for his injuries. On July 17, 2006, eleven days after the accident, McNeill reported that he was feeling better and Dr. Hines released him to attempt to return to work for one week. In August, Dr. Hines referred McNeill to a neurosurgeon who did not recommend surgery. McNeill testified that he went back to work because no one else could perform his duties. He did not return to full duty but he admitted driving the forklift and unloading vans after July 17. White testified that McNeill could not perform his job after the accident and that it was *913 necessary for him to perform some of McNeill's supervisory duties.
McNeill also described the August 24 explosion. McNeill testified he was at the loading dock when he saw smoke coming from the third floor of the plant. He instructed some of the men to get out and they headed outside of the plant toward the woods. The explosion of the building knocked McNeill off of his feet onto his left side. He testified that he fell on his left shoulder and injured his back but received no new injuries, except headaches and dizziness, as the result of the explosion. McNeill testified he was still in pain from the previous incident on the day of the explosion. He was taken directly to the hospital and released. He saw Dr. Hines the next day. At the time of trial, he remained under the care of Dr. Hines and had not returned to work.
Since the explosion, McNeill has attended physical therapy, wears a TENS unit for pain and takes anti-depressants. He has been in pain since the first accident. McNeill testified that he no longer hunts, goes to church or engages in sexual relations with his wife. He testified that these activities changed after the first accident.
Rita McNeill testified that after the July 6 accident, her husband was in pain. She stated that McNeill returned to work in pain. After the explosion, Mrs. McNeill testified that her husband had the same pain as before the incident and received no new injuries. She stated that after July 6, her husband could no longer take out trash, carry in groceries or do home maintenance. She testified that before the accident, she and McNeill did many social things together. After July 6, they no longer do those things together and are not intimate. Rita McNeill noted that her husband has trouble sleeping and takes abundant medication.
Dr. Carl Hines, an expert in general medicine, testified on behalf of McNeill. Dr. Hines confirmed that he first saw McNeill on July 11, 2006, for left shoulder injuries and back pain. For the accident injuries, Dr. Hines prescribed anti-inflammatory medication and muscle relaxers. On July 17, McNeill returned and told Dr. Hines he was doing a little better and could move his neck. Dr. Hines recommended that he try to go back to work and McNeill was willing to do so. McNeill returned on July 21, with continuing pain in his left shoulder and rhomboid muscles in his back and lower back pain. On July 21, Dr. Hines ordered an MRI of McNeill's shoulder and neck. The MRI showed arthritis in his thoracic spine or chest and degenerative disc disease in his cervical spine. The MRI also showed mild compression of the thoracic spine and spondylosis of the lumbar spine. Dr. Hines testified that McNeill's pre-existing degenerative disc problems existed more probably than not before the accident although he believed they could be caused by a jerking or jolting accident. Dr. Hines again saw McNeill on August 2 when he discussed the MRI results with him. Dr. Hines referred McNeill to a neurosurgeon who made the same diagnosis as Dr. Hines in October of 2006.
Dr. Hines saw McNeill on August 25, 2006, the day after the explosion. At that time, Dr. Hines diagnosed him with left shoulder and elbow contusions, pain, tenderness and muscle spasm of the lower back and a neck bruise. Dr. Hines testified that in his opinion, McNeill suffered no new injury that was the result of the explosion, but rather an aggravation of already existing injuries. Nevertheless, he was not able to determine what would have been McNeill's condition had he not had been involved in the explosion. Dr. Hines recalled that McNeill did not return to work after August 24, 2006, and that he *914 was disabled at the time of trial and unable to engage in gainful employment. Dr. Hines continued to treat McNeill conservatively until the time of trial.
On cross-examination, Dr. Hines conceded that he first diagnosed McNeill with cervical strain after the explosion. He also agreed that McNeill did not complain of constant back pain or back pain radiating into his groin until after the explosion. McNeill also made his first complaint of leg tingling and aching and pain in his left hip after the accident. He also first mentioned pain running from his neck down his arm to his left fingers in March of 2007 and pain from his buttocks running down both legs in May of 2007. He was diagnosed with sciatica on October 12, 2006, and brachial radiculopathy in February of 2007. In all, Dr. Hines agreed that McNeill expressed fourteen new complaints after the explosion. He also testified that McNeill was first placed on narcotic pain medication, physical therapy and pain relief treatment after the explosion because he was having more pain than before the explosion. Dr. Hines testified that it would be difficult to say what injuries were caused by what incident.
From this evidence, particularly Dr. Hines' observations, McNeill's preexisting degenerative disc problems and his two work-related accidents presented the jury difficult choices regarding the cause or causes of McNeill's present condition. Was it unreasonable for the jury to conclude that McNeill's injuries from the forklift accident did not cause the long-term back condition from which he now suffers? We conclude that the evidence of his improvement and return to work before the explosion allows for such a conclusion. With Dr. Hines' difficulty in relating all of McNeill's injuries to the initial incident and his admission that McNeill expressed fourteen new complaints after the explosion, we can find no abuse of discretion in the jury's apparent determination that the August 24 explosion was the cause of McNeill's disability thereafter.
Moreover, because the evidence shows that McNeill was able to return to work and perform his duties after July 17, 2006, we cannot find the low general damages award of $1,000 for the soft tissue injury to be an abuse of the jury's discretion. For the same reasons, the jury's award of one week of lost wages and its denial of consortium damages to Rita McNeill may be affirmed.

Conclusion
For the foregoing reasons, the judgment is affirmed. Costs of this appeal are assessed to McNeill.
AFFIRMED.
NOTES
[1] The Louisiana Workers' Compensation Corporation intervened in the suit. At trial Landstar stipulated its responsibility for the medical expenses claimed by the LWCC up to the percentage of fault that might be assessed against it.
[2] Although the witnesses' references to White as the "flagman" is repeated in this opinion, he motioned to Ledford with his hands.
[3] On cross-examination, McNeill's economic expert witness agreed that one week of work at McNeill's salary would be valued at $1,000 and that was the amount of the jury's award for lost wages.