BROWN, Chief Judge.
11While driving home in the early morning hours of July 1, 2004, plaintiff, Robert Caskey, hit a tree in the road that had fallen from a road construction servitude adjacent to the roadway. Caskey and his wife Kathy filed suit against Merrick Construction Co., Inc., the contractor which had been removing trees from the location. A jury assessed Caskey with 79% fault and Merrick Construction with 21% fault and awarded damages. The trial court granted plaintiffs’ Motion for Judgment Notwithstanding the Verdict (“JNOV”) finding Caskey free from fault and assessing the damages to Merrick Construction. The jury’s low awards for damages were also increased. This appeal ensued. We affirm.

Facts

At approximately 11:00 p.m. on June 30, 2004, Robert Caskey drove from his home in Jonesboro to Monroe, Louisiana, to retrieve newspapers for his wife’s paper delivery job. Upon his return home at approximately 2:00 a.m., shortly after Caskey exited a curve on LA Highway 4 West, his truck struck a tree that had-fallen across both lanes of travel. Caskey testified that he was traveling at approximately 45 miles per hour with his bright lights activated when the collision occurred. Caskey noticed the tree when he was approximately eight feet from it. He recalled that his truck moved upward and he saw a limb as his vehicle “went into the fork of that tree.” The truck hit the limb again, “went back down” and “stopped.” Photographs of the truck depict that most of that damage was on the driver’s side windshield and roof. The driver’s side air bag deployed. Caskey was able to climb out of the window.
12Four Jackson Parish Sheriffs employees responded to the scene. Caskey was transported to a local hospital where he was treated and released. A storm had passed through the area on the evening of the accident. However, at the time of the accident the storm had ended.
The Louisiana Department of Transportation and Development (“DOTD”) had begun a project for the repair of bridges along Highway 4 when this accident occurred. To reconstruct the bridge for site 7, the DOTD purchased temporary construction servitudes from private individuals and contracted with Merrick Construction for the clearing and grubbing of the land. At the time of the accident Merrick Construction was in the process of clearing the servitude. Work on the bridge had not yet begun, and the detour road had not yet been built.
The tree which fell on the road was located within the DOTD construction servitude. The location was a wet and marshy ground. The tree was described as a water oak with a shallow root system and was estimated to be between 70 and 85 feet tall. The last clearing work that Merrick Construction had performed at the site was on June 17, 2004, and due to equipment repair the work had halted. A DOTD project manager had last inspected the site on June 14, 2004.
On August 20, 2004, Robert and Kathy Caskey filed suit against the DOTD and Merrick Construction. The DOTD was dismissed from the suit by summary judgment which was affirmed by this court in Caskey v. Merrick Construction Co., Inc., 41,662 (La.App.2d Cir.01/24/07), 949 So.2d 560, writ denied, 07-0576 (La.05/04/07), 956 So.2d 619. Jury trial | ¡¡proceeded against the contractor in April of 2010. *192 The jury verdict assessed Caskey with 79% fault and Merrick Construction with 21% fault. The jury awarded Caskey general damages of $1,872.50, past, present and future medical expenses of $3,150 and loss of consortium damages of $472.52 to Kathy Caskey.
Thereafter, plaintiffs filed a motion for JNOV seeking an assessment of 100% fault to Merrick Construction and an increase in the damage awards. After considering the arguments of counsel, the trial court granted JNOV in favor of the Cas-keys, assigning Merrick Construction with 100% fault. The court increased the general damage award to $150,000, the medical expenses to $24,587.45 and Mrs. Cas-key’s loss of consortium award to $25,000. The trial court additionally awarded Cas-key loss of enjoyment and quality of life damages of $25,000. It is from this judgment that Merrick Construction has appealed.

Discussion

Liability

Defendant first argues that both the jury’s verdict and the trial judge’s JNOV ruling were manifestly erroneous as the evidence showed Merrick Construction to be free from fault. In making this argument, defendant asserts that the tree fell as the result of an act of God. Alternatively, defendant asserts that it is immune from liability by virtue of La. R.S. 9:2771.
Under Louisiana’s duty-risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her [4conduct to a specific standard of care; (2) the defendant failed to conform his or her conduct to the appropriate standard of care; (3) the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries; (4) the defendant’s substandard conduct was a legal cause of the plaintiffs injuries; and (5) actual damages. Christy v. McCalla 11-0366 (La.12/06/11), 79 So.3d 293; Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217 (La.04/03/02), 816 So.2d 270.
An act of God in the legal sense acts as a defense sufficient to excuse the defendant’s neglect of a duty and relieve him of liability for injury. Southern Air Transport v. Gulf Airways, 215 La. 366, 40 So.2d 787 (La.1949); see also Hanks v. Entergy Corp., 06-477 (La.12/18/06), 944 So.2d 564.
La. R.S. 9:2771 provides as follows:
No contractor, including but not limited to a residential building contractor as defined in R.S. 37:2150.1(9), shall be liable for destruction or deterioration of or defects in any work constructed, or under construction, by him if he constructed, or is constructing, the work according to plans or specifications furnished to him which he did not make or cause to be made and if the destruction, deterioration, or defect was due to any fault or insufficiency of the plans or specifications. This provision shall apply regardless of whether the destruction, deterioration, or defect occurs or becomes evident prior to or after delivery of the work to the owner or prior to or after acceptance of the work by the owner. The provisions of this Section shall not be subject to waiver by the contractor.
Immunity statutes are strictly construed against the party claiming the immunity and must not be extended beyond their obvious meaning. Monteville v. Terrebonne Parish Consolidated Government, 567 So.2d 1097 (La.1990).
|fiThis statute departs from the more general standard that every construction contract be performed in a good, workmanlike manner, free from defects in materials and workmanship. Allstate En *193 terprises, Inc. v. Brown, 39,467 (La.App.2d Cir.06/29/05), 907 So.2d 904. It provides a safe harbor to the contractor so long as plans and specifications are not provided by him. A contractor who strictly adheres to plans or specifications furnished to him is relieved of liability to third persons when the contractor has no reason to believe that alleged deficiencies contained in such plans and specifications would lead to a dangerous condition. Dumas v. Angus Chemical Co., 81,399 (La.App.2d Cir.01/13/99), 729 So.2d 624; Arnold v. Our Lady of the Lake Hospital, Inc., 562 So.2d 1056 (La.App. 1st Cir.1990).
At the trial of this matter, the jury reviewed photos of the fallen tree and work site and heard the testimony of forestry experts, the project managers and state inspectors.
Gordon Thomas, the DOTD project supervisor for the bridge work, confirmed that Merrick Construction was hired to clear and grub the construction servitude and that it had been given construction plans for the project. Thomas learned of the accident late in the morning of July 1, 2004, hours after the accident. He traveled to the site to take measurements and photographs. The measurements were made from the centerline of the road to the center of the hole left by the tree, for a distance of 55 feet. Thomas concluded that the tree that fell was located within the construction servitude. Its location was right at the beginning of the right-of-way area | fiwhere the eventual detour route for the existing roadway would start and act as a bypass during the bridge replacement.
Thomas recalled that the road and the servitude were wet because a storm had gone through the area the night before the accident. Thomas testified that he believed the tree had a shallow root system and that the area was low, wet and marshy. He identified certain photographs (some of which he took and others taken by the Caskeys’ son) of the location which were introduced into evidence. The photos reveal that recent dirt work and tree removal had occurred adjacent to the tree, leaving it on the eastern edge of where the detour route was to begin. From these photographs, Thomas testified that it “looked” like the area around the tree had been “worked over” by heavy equipment. Thomas identified a close-up photograph of the tree that fell and identified a mark on the tree where something had hit it. He opined that heavy equipment made the mark on the tree.
Thomas testified that at the time of his last inspection in June, the tree in question was still standing and at that time he did not believe that the tree was hazardous. Thomas considered that wind from the storm may have caused the tree to fall, but he agreed that the very old tree had withstood previous storms. He did not find any other trees along the servitude that had blown down. Finally, Thomas agreed that the removal of tree buffers, the location of a tree in a low marshy area and the striking of the tree by heavy equipment would all increase the risk of the tree falling.
Roderic Roy Rozas, Merrick Construction’s field project superintendent for site 7, testified that he learned that the tree was located 17within the construction servitude six years after the accident. He went to the location the morning of the accident when Thomas was there, but did not take any photographs or measurements. Rozas did not recall that the tree posed any threat before it fell. He did not believe that the tree in question was the only tree left on the servitude. Rozas stated that he had received no instruction from Thomas to remove the tree.
*194 Rozas agreed that the gouge mark appeared to be made by heavy equipment. He explained that a track hoe was used to remove trees from the site because the location was very wet. With the track hoe, a Komatsu 800, the root system of the tree would be broken up about six inches from the base of the tree on three sides. The bucket of the track hoe would then be placed about halfway up the trunk of a tree and pushed against it, which would cause the tree to topple over. Rozas testified that the Komatsu 300 had received body damage so it had been sent in for repairs. The last work done on the site by Merrick Construction occurred on June 17, 2004.
Claude Hughes, plaintiffs’ forestry expert, determined that the tree which fell was an 85 foot tall, 70-year-old water oak. Hughes testified that the root system of the tree was very shallow because it was growing in a wet place. Hughes explained that in marshy areas, the operation of heavy equipment over soil can disturb the root system as close to the surface as 8 to 10 inches. Hughes stated that a tree of that size with a shallow root system would not require a lot of force to take it down. From his review of the photographs, Hughes testified that he believed that the roots of the felled tree had been scraped or damaged. The removal of the buffer trees on two 18sides also weakened the tree and made it more susceptible to falling over. Hughes believed that the storm produced no significant wind due to the fact that no other trees were blown down in the area. With the buffers gone and the tree’s shallow root system, Hughes did not believe that a strong wind would have been necessary to blow this tree down especially with its damaged roots. Hughes reviewed a photograph of the fallen tree and explained that he saw a sort of a square cut where the root ball was missing. In his opinion this was consistent with something cutting through part of the root system. Hughes also opined that an oak tree in a low, wet, marshy area with damaged roots and no surrounding buffer trees created a potential falling hazard to motorists using Highway 4. He testified that Merrick Construction should have certainly known about the hazard posed by such a tree.
John Adams testified as defendant’s expert in forestry and bottomland hardwood trees. Adams reviewed the photographs and depositions and twice traveled to the scene. Adams testified that in his 30 years’ experience he had seen many healthy trees uprooted with surrounding trees still standing. He explained that the reason healthy trees fall is wind throw. Adams testified that if he had gone out to the site on June 30, 2004, he would not have been able to predict that the tree would fall. Nor did he think that anyone could predict that a storm would cause the tree to fall. Adams testified that the gouge mark had nothing to do with the tree falling because the size of the gouge mark would not affect the tree’s root system. He admitted that a 36-ton piece of equipment could tear up the root system li)Of the tree, but it depended upon how much the roots were run over by the equipment. He was unable to determine if the equipment in question tore up the roots in this case. Adams agreed that if the roots of the tree were destroyed and the buffers were removed, the wind from a storm could blow the tree down. He could not say that the tree would fall because he had seen trees with disturbed roots last for 50 years. Adams opined that in this case the tree fell because of the windstorm.
The evidence shows that at the time of the accident the detour route in the servitude area was in its initial phase of construction with the ground having been recently disturbed by the heavy track hoe. *195 The remains of brush and tree limbs were scattered around the base of the fallen tree. Merrick Construction had a duty to exercise caution in its clearing work around the tree so that the root system of the tree, which was extremely shallow, would not be damaged. The tree’s location near the existing highway, which had not yet been closed for the detour, enhanced the risk that any damage or trauma to the tree could cause a traffic hazard, especially considering the tree’s shallow root system and defendant’s removal of buffer trees from two sides of the tree.
The act of God defense involves a “but for” analysis stated by the Louisiana Supreme Court in Saden v. Kirby, 94-0854 (La.09/05/95), 660 So.2d 423. Clearly, violent storms or other events in nature can be recognized as the prevailing cause of damage. However, storm winds of a lesser degree may not act as a defense if the damage would not have occurred but for the defendant’s conduct or omission which combined with | inwind in causing the damage. Saden, supra; Brantley v. Tremont & Gulf Railway Co., 226 La. 176, 75 So.2d 236 (La.1954); see also Hanks, supra.
In finding Merrick Construction at fault, the jury and the trial judge could easily have determined that the winds in question on the night of the storm were not so extreme as to demonstrate an overpowering act of nature. No other trees in the area were shown to have fallen. The disputed fact issue concerned the damage to the tree’s root system and its exposure to more wind because of Merrick Construction’s clearing work around the tree’s base. We find that the factual conclusion that the tree root system had been weakened was not unreasonable or clearly wrong. In combination with the storm’s wind, Merrick Construction’s failure to exercise reasonable caution regarding the tree, caused the tree to fall and amounted to fault.
We further disagree with Merrick Construction’s assertion that the immunity statute, La. R.S. 9:2771, applies in this case. The skill and expertise required for Merrick’s employment of its work efforts around the tree did not involve a “work according to plans and specifications” furnished by the DOTD. We will not interpret this immunity statute so broadly as to abrogate defendant’s general duty to act reasonably in the employment of its skills on this construction site.

Grant of JNOV: Liability/Fault

Defendant asserted as an affirmative defense comparative fault on the part of Cas-key. In determining liability, the jury assessed Merrick Construction with 21% fault and Caskey with 79% fault. The trial judge |; Reversed that finding in its JNOV ruling and found no fault on the part of Caskey. Defendant has appealed from this ruling.
La. C.C.P. art. 1811 provides for the JNOV procedure. A trial court is authorized to grant a JNOV on the issue of liability or damages or both. La. C.C.P. art. 1811(F); Robinson v. Fontenot, 02-0704, 02-0733 (La.02/07/03), 837 So.2d 1280. The supreme court in Joseph v. Broussard Rice Mill, Inc., 00-0628 (La.10/30/00), 772 So.2d 94, noted that in Scott v. Hospital Service District No. 1 of St. Charles Parish, 496 So.2d 270 (La.1986), the court set forth the criteria in determining when a JNOV is proper. According to the court, JNOV is proper when the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict. See also, Wegener v. Lafayette Insurance Co., 10-0810, 10-0811 (La.03/15/11), 60 So.3d 1220; Lastrapes v. Progressive Security Insur *196 ance Co., 10-0051 (La.11/30/10), 51 So.3d 659.
The standard for reviewing a JNOV is the manifest error standard. Martin v. Heritage Manor South Nursing Home, 00-1023 (La.04/03/01), 784 So.2d 627; Davis v. Wal-Mart Stores, Inc., 00-0445 (La.11/28/00), 774 So.2d 84. A motion for JNOV presents the legal question of whether there is sufficient evidence to support a jury verdict. Holt v. Cannon Express Corp., 31,271 (La.App.2d Cir.12/11/98), 722 So.2d 433. In reviewing the JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. Martin, supra; Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La.1991). The appellate court uses thejjgsame criteria as the trial court to determine if the trial court properly granted a JNOV, i.e., do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict? After determining that the trial judge correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review. Martin, supra; Davis supra, Anderson, supra.
Individual drivers have a duty to operate, control, and use their automobiles reasonably, and to maintain a proper lookout for hazards which might pose an unreasonable risk of harm. Stone v. Bullard, 43,996 (La.App.2d Cir.01/28/09), 2 So.3d 1241. A driver may generally assume that the road is safe for travel and he is not required to anticipate unexpected obstructions in his lane to traffic which are, under the circumstances, difficult to discover. Wimberly v. McCoy Tree Surgery Co., 33,761 (La.App.2d Cir.08/25/00), 766 So.2d 729. A driver who uses a public state highway at night is not charged with the duty of guarding against an unexpected or unusual obstruction which he had no reason to suspect he would encounter and which was difficult to see. Davis v. Smith, 35,117 (La.App.2d Cir.10/02/01), 796 So.2d 765, writ denied, 01-2887 (La.01/25/02), 807 So.2d 250.
As noted above, in reviewing the record de novo, this court uses the same criteria used by the trial judge in granting JNOV to determine whether the trial judge erred in granting JNOV to the jury’s apportionment of fault. We find that the trial court properly granted plaintiffs’ motion for JNOV on |13the issue of fault, having concluded that there is no reasonable view of the evidence which permits the jury’s determination that Caskey was 79% at fault for the accident. See, Chisholm v. Clarendon National Insurance Co., 37,022 (La.App.2d Cir.07/09/03), 850 So.2d 1070, writ denied, 03-2608 (La.01/09/04), 862 So.2d 983.
The following is excerpted from the trial court’s written Reasons for Judgment in support of its JNOV grant:
The area where the accident occurred is located in rural Jackson Parish. There are woods on both sides of the road. There is no lighting in the area. Prior to the accident, a storm had occurred and it had been raining. The investigating officer described the lighting as “pitch black.” The accident occurred outside of a long curve in the road as one traveled to Jonesboro. Mr. Caskey testified that he was traveling 45 miles per hour (speed limit is 55), he had his lights on bright, and saw the tree about a car’s length away before he collided with it and he was unable to stop.
Mr. Caskey was quite candid in his testimony about his prior osteoarthritic condition. He acknowledged taking a Lor-tab at approximately 6:00 p.m. on the *197 night of June 30, approximately seven and one-half to eight hours prior to the accident. He had taken the prescription medication for years and was not restricted by any physician from driving. There was no evidence he was driving erratically prior to the accident either on the trip to Monroe or on the return trip to Jonesboro, until he encountered the oak tree blocking the road. (Emphasis added).
The accident was investigated by Deputy George Jones of the Jackson Parish Sheriffs Office. The court finds that Deputy Jones is an experienced accident investigator. Deputy Jones testified that he received the call about the accident at approximately 2:00 a.m. on the morning of July 1. He described the lighting at the scene as “pitch black.” He observed the tree in the road and the Caskey vehicle. He found that Robert Caskey had not committed any traffic violation. No traffic citations were issued. He observed Mr. Caskey and found that he was normal and that he was not operating the truck while impaired. Deputy Jones also testified that the conditions and visibility that night were such that he would have run into the tree himself if he had not received the call and known the tree was in the roadway. Deputy Jones was the only eyewitness to the conditions that existed that night to testify. The defendants called no witnesses \uto dispute either his or Robert Caskey’s testimony concerning the conditions on the night of the accident or the accident itself. (Emphasis added).
The trial court did not err in granting plaintiffs’ motion for a JNOV. There is absolutely no evidentiary support for Merrick Construction’s contention that Caskey caused or contributed to the accident. The testimony showed that the accident occurred at approximately 1:30 a.m. on a rural portion of a state highway. There was no lighting in the area. It had been rainy and stormy the night of the accident and the roadway was wet. The uncontradicted evidence showed that Robert Caskey exercised the appropriate degree of care expected of a driver under the particular conditions and potential hazards existing at the time.
As for defendant’s contention that Cas-key was impaired and that this condition caused or contributed to the accident, we likewise find no evidence to support this claim. Although he had taken a prescription-strength narcotic for a chronic osteo-arthritic condition approximately eight hours prior to the accident, there was no evidence that his driving was in any way impaired. Deputy Jones specifically stated that he observed Caskey and found him to be normal and not operating his vehicle under impaired conditions. As noted by this court in Smeby v. Williams, 37,845 (La.App.2d Cir.12/10/03), 862 So.2d 381, 382, the relevant inquiry in such a case is whether consumption of alcohol, or, as in this situation, a controlled substance, impaired plaintiffs driving. As in Smeby, there is no evidence to support the conclusion that Caskey was impaired at the time of the accident.
| KGrant of JNOV: Damages
Defendant has also appealed from the trial court’s grant of JNOV increasing the damages awarded to plaintiffs, Robert and Kathy Caskey.
A JNOV is the procedurally correct device for raising or lowering an unreasonable damage award. La. C.C.P. art. 1811; Fox v. Layton, 42,491 (La.App.2d Cir.10/17/07), 968 So.2d 302. When the trial court has determined that a JNOV is warranted because reasonable men could not differ on the fact that the award was either abusively high or abu *198 sively low, it must determine what is the proper amount of damages to be awarded. The trial court is to make a de novo award based upon its independent assessment of damages. Anderson, supra; Fox, supra.
If the appellate court determines that the trial court properly granted the JNOV, i.e., that reasonable men must find that the jury award was an abuse of discretion, the trial court’s damage assessments are reviewed under the standard set forth in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). See Anderson, supra; Wilson v. National Union Fire Insurance Co. of La., 27,702 (La.App.2d Cir.12/06/95), 665 So.2d 1252.
Before an appellate court can disturb an award made by a trial court, the record must clearly show that the trier of fact abused its discretion in making its award. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993); Coco, supra. Only after finding that the lower court abused its vast discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point that is reasonably within the discretion of the trial court. Coco, supra. As noted |1fiby the court in Coco, 341 So.2d at 335-36, “It is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence.... [I]t is impossible for an appellate court to judge what evidence in a particular case was given special weight by the finder of fact.”
We find that the trial court properly granted plaintiffs’ motion for JNOV on the issue of damages. The award by the jury in this case was abusively low.
As noted by the trial court, Dr. Rebecca Crouch, Caskey’s treating physician, was the only doctor who testified (via videotaped deposition). There was no medical testimony or evidence whatsoever offered by Merrick Construction concerning the injuries Caskey received as a result of the accident. Therefore, as found by the court, Dr. Crouch was in the best position of any of the witnesses to testify about Caskey’s medical condition before and after the July 2004 accident as well as the injuries caused by the incident.
Dr. Crouch stated she treated Robert Caskey for a number of years before his July 2004 accident for osteoarthritis, which is a degenerative bone and joint disease. Dr. Crouch also treated Caskey for injuries he sustained as a result of his July 1, 2004, accident beginning on the morning of the accident and for the next six years up through the trial. Dr. Crouch observed that Caskey had been a patient for a number of years before his accident, and that at the time of the incident he was currently in treatment for osteoarthritis. On July 1, 2004, after first being treated at the local | ^emergency room, Caskey presented to Dr. Crouch with initial complaints of neck and shoulder pain. However, by his second visit, he was reporting constant and heightened pain in his neck and lower back.
Dr. Crouch testified that before his accident, Caskey experienced few if any problems with his back other than his osteoarthritis.[1] After his July 2004 accident, however, Dr. Crouch observed muscle spasms from T-10 to L-3 on the left side and from T-12 to L-3 on the right side of Caskey’s spine. . A positive straight leg *199 raising test showed that Caskey was having a problem at the Ll-2 level of his lumbar spine.
When her patient did not have any improvement, Dr. Crouch referred him to the Jackson Parish Therapy Center for physical therapy, which he did from August 20, 2004, through November 2, 2004. An MRI performed on September 30, 2004, showed a herniated disc at Ll-2. Dr. Crouch opined that it was more probable than not that Caskey’s collision at a speed of approximately 45 mph caused his herniated disc.
Because his pain doubled in intensity following his accident, Dr. Crouch prescribed 3-A Lortabs daily to control Cas-key’s pain, whereas prior to the incident he was only taking 1-2 Lortabs daily. She also prescribed a muscle relaxer which he had not needed prior to the accident. For the first couple of years following the accident, Caskey required more frequent cortisone injections. According to Dr. Crouch, Caskey will be taking the increased dosage of pain medication for the rest of his life. Due to a serious |18heart condition and chronic lung disease, Caskey is not a candidate for back surgery which is the typical treatment for a ruptured disc.
Dr. Crouch testified that the accident severely aggravated Caskey’s underlying, pre-existing osteoarthritis. With an acceleration in the osteoarthritic condition precipitated by the accident, Caskey could be expected to have future problems with increased pain and inflammation. This pain has already reduced his mobility, which increases the possibility for complications from his heart and lung problems.
Defendant offered no medical evidence whatsoever to contradict the testimony of Dr. Crouch, Robert Caskey’s treating physician. Caskey’s outpatient record from 1997 shows that at that time, his problem was with a disc herniation at the S-l nerve root. The MRI done after the July 1, 2004, accident shows injury at Caskey’s Ll-2 level, which is nowhere near the S-l nerve root. Furthermore, while Dr. Crouch could not pinpoint the exact date of the rupture at Caskey’s Ll-2 just by looking at the MRI films, based upon his complaints and description of the accident, as well as x-rays and the MRI, it was Dr. Crouch’s opinion that this injury was more probably than not caused by the accident. She further opined that the accident caused severe aggravation to Caskey’s preexisting osteoarthritic condition. According to Dr. Couch, because of acceleration in the condition caused by the accident, Caskey would have problems with increased inflammation and pain in the future.
Robert Caskey testified that immediately after the accident, he started getting stiff and tightening up. He went by ambulance to the Jackson Parish |19Hospital, where x-rays were taken and he was referred to Dr. Crouch for a follow-up visit later that morning. She sent him to physical therapy for a couple of months which helped with the pain. He returned, however, to Dr. Crouch still experiencing constant low back pain. According to Caskey, the accident changed his life. His pain level is greater and he now has muscle spasms, something he never had prior to the accident. Caskey described the pain as being on his left side and leg and in his hip across his lower back. At times he has neck pain and headaches and sometimes he gets numbness in his fingers. He testified that he also experiences sciatic nerve pain. He takes muscle relaxers in addition to the painkillers he was already taking on a daily basis. He is unable to garden, fish, hunt, travel, or work on his car at the level he could enjoy before the accident. While he can still spend time with his six grandchildren, since the accident he cannot be *200 active with them like he was before. Cas-key testified that his pain also prevents him from getting a good night’s sleep. He has periods of time when he is unable to dress himself. While he can bend with a lot of care, he can’t do so without feeling pain and has lost mobility. Caskey is able to shower, although he cannot take a bath. Caskey related that the frequency of sexual relations with his wife has decreased.
Kathy Caskey testified as of the time of trial, she and her husband Robert had been married 40 years. On the night of her husband’s accident she received a call from the Sheriffs Department telling her that her husband had been involved in an automobile accident. Her son drove her to the scene and she saw her husband’s truck. She spoke with Caskey who 1 20was dazed and went with him to the hospital. The day following the accident, Mrs. Cas-key recalled that her husband was in a lot of pain and he was stiff. Kathy Caskey confirmed that since the accident, her husband’s pain has continued to get worse, limiting his activities such as hunting, doing yard work and helping around the house. He sometimes has trouble sleeping, which causes her difficulty sleeping and prevents either of them from getting rest. Mrs. Caskey stated that before the accident, her husband had struggled with back pain but not the level of pain he experienced after the accident. Their sex life has been negatively affected in that her husband is in lots of pain and she stresses because she worries that sexual activity would hurt him or cause undue injury. Mrs. Caskey stated that he husband is not as playful with her or the grandchildren anymore either since the accident.
One injured through the fault of another is entitled to full indemnification for damages caused thereby. Wainwright v. Fontenot, 00-0492 (La.10/17/00), 774 So.2d 70; State Farm Mutual Automobile Insurance Co. v. Berthelot, 98-1011 (La.04/13/99), 732 So.2d 1230. A defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. Wainwright, supra. Although the damages caused are greater because of a prior condition of the victim which is aggravated by the tort, the tortfeasor is, nevertheless, responsible for the consequences of his tort. Britt v. City of Shreveport, 45,513 (La.App.2d Cir.11/03/10), 55 So.3d 76. Before recovery can be granted for aggravation of a pre-existing condition, a causative link between 12i the accident and the victim’s current status must also be established. Edwards v. LCR-M Corp., Inc., 41,125 (La.App.2d Cir.07/12/06), 936 So.2d 233.

(1) General Damages

General damages are those which may not be fixed with pecuniary exactitude; instead, they involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or lifestyle which cannot be definitely measured in monetary terms. Duncan v. Kansas City Southern Railway Co., 00-0066 (La.10/30/00), 773 So.2d 670, cert. dismissed, 532 U.S. 992, 121 S.Ct. 1651, 149 L.Ed.2d 508 (2001). Pain and suffering, both physical and mental, refers to the pain, discomfort, inconvenience, anguish, and emotional trauma that accompany an injury. McGee v. A C & S, Inc., 05-1036 (La.07/10/06), 933 So.2d 770. The elements of physical pain and suffering and associated mental anguish are conceptually related and to a large extent overlapping, and therefore difficult to precisely distinguish. Harris v. Delta Development Partnership, 07-2418 (La.App. 1st Cir.08/21/08), 994 So.2d 69.
*201 Also included in general damages can be an award for loss of enjoyment or quality of life. Miller v. Lammico, 07-1352 (La.01/16/08), 973 So.2d 693; Britt, supra. These damages refer to the detrimental alterations of a person’s ability to participate in the activities or pleasures of life that were formerly enjoyed. McGee, supra.
| a2After carefully considering the evidence relating to Caskey’s injuries and their effect on his life, we cannot say that the trial court’s award of $150,000 for pain, suffering, mental anguish and distress and disability and $25,000 for loss of enjoyment or quality of life constitutes an abuse of its vast discretion.

(2) Loss of Consortium

In general, a claim for loss of consortium has seven elements: (1) loss of love and affection, (2) loss of society and companionship, (3) impairment of sexual relations, (4) loss of performance of material services, (5) loss of financial support, (6) loss of aid and assistance, and (7) loss of fidelity. To be compensable, it is not necessary for a claim for consortium to include damages from each type of loss. Britt, supra; Crownover v. City of Shreveport, 43,521 (La.App.2d Cir.09/17/08), 996 So.2d 315. Proof of any one of these elements is sufficient to support an award of loss of consortium damages. McNeill v. Landstar Ranger, Inc., 43,362 (La.App.2d Cir.06/11/08), 986 So.2d 905, writ denied, 08-1558 (La.10/10/08), 993 So.2d 1287.
In the instant case, the trial court noted that Robert and Kathy Caskey had been married for 40 years as of the time of trial. Both testified to an active sex life prior to the accident, and that since the incident, their sex life was basically nonexistent. The court observed that after the accident, Caskey could no longer mow his yard or take care of the garden, change the oil in their vehicles or help with the shopping. Caskey was not able to get a good night’s sleep and would often sleep in a separate room. Kathy Caskey Instated that the injuries her husband received in the accident had caused a significant change in their lifestyle.
The trial court’s award of $25,000 is supported by the evidence and is not an abuse of discretion.

(3) Past, Present, and Future Medical Expenses

Under Louisiana law, a tort victim may recover past (from injury to trial) and future (posttrial) medical expenses caused by tortious conduct. Menard v. Lafayette Ins. Co., 09-1869 (La.03/16/10), 31 So.3d 996; Frank L. Maraist & Thomas C. Galligan, Jr., Louisiana Tort Law § 7.02[1], 7-5 (Michie 2009). A plaintiff bears the burden of proving special damages by a preponderance of the evidence. In meeting this burden of proof on the issue of future medical expenses, the plaintiff must show that, more probably than not, that these expenses will be incurred and must present medical testimony that they are indicated and the probable cost of these expenses. Daigle v. City of Shreveport, 46,429 (La.App.2d Cir.10/05/11), 78 So.3d 753, writ denied, 11-2472 (La.02/03/12), 79 So.3d 1027. In the instant case, we find the trial court’s award of damages to be reasonable. The money awarded for Caskey’s past medical expenses, $14,745.45, is accurate considering the evidence of the bills submitted by plaintiffs for the ambulance and treatment the morning of the accident, physical therapy, an MRI, Dr. Crouch’s treatment, and prescription medication.
As for future medical expenses, Dr. Crouch testified that Caskey will continue to take increased pain medication as *202 a result of the accident. ^Considering that Caskey will have to take pain medication for the rest of his life, that the cost of his medication in 2009 was $1,406, and that one-half of that amount was $703, the court found Caskey to have a reduced life expectancy of 14 rather than 20 years based upon his pre-existing conditions of osteoarthritis, heart disease and lung problems and awarded $9,842 (14 times $703) for future medical expenses for pain medication for 14 years. We find no abuse of the trial court’s discretion in this award.

Conclusion

For the foregoing reasons, the trial court’s judgment is AFFIRMED. Costs of this appeal are assessed to defendant-appellant, Merrick Construction Co., Inc.
CARAWAY, J., dissents with written reasons.

. On cross-examination Dr. Crouch testified about Caskey’s long history of back problems. However, she stated that there were no x-rays taken prior to his accident which showed a disc herniation or degeneration (actually what the x-rays would have shown was a narrowing of the disc space which would indicate a herniated or degenerated disc) at Ll-2.