BROWN, Chief Judge.
hOn December 10, 2012, J.B., a fourth grader at Carrie Martin Elementary School in Plain Dealing, Louisiana, was injured while on the playground at recess when three other boys knocked him to the ground several times to keep him from seeking assistance from or “tattling” to the teacher on duty. Plaintiffs, Jeff and Daisy Brammer, filed suit individually and on them son’s behalf, against defendants, the Bossier Parish School Board (“BPSB”), and Trida Huckaby, one of the teachers on duty when the incident occurred. After a trial on the merits, a jury found in favor of plaintiffs and against defendants, awarding J.B. $125,000 in general damages and $12,674.14 in special damages .and Daisy Brammer $25,000.for loss of consortium. On October 20, 2014,.the trial court entered a judgment in accordance with the jury’s verdict and also ordered defendants to pay $4,110.60 in additional -costs. The total judgment against defendants is $166,784.63, together with legal interest. Defendants filed the instant appeal and also filed in this court an exception of no right of action in this Court.[1]

Discussion

We deny the exception no right of action filed by defendants. The Brammers lived in the Plain Dealing school district. Following this accident, they attempted to move their children to a school in the Bossier City district by executing a document to turn over care and custody to Jesse Williams. Defendants claim that the Brammers had no right to file this | glawsuit. . La.- C.C. art. 220 at that time[2] provided that- parents could delegate a part of their authority to teachers, schoolmasters and others to whom they intrust their children for their education, such as the power of restraint and correction ...; this article has nothing to do with the transfer or modification of the regime of parental authority.[3] As the exceptor, defendants had the burden of proving that plaintiffs lacked the procedural capacity to sue; as noted above, this burden was not met.

*611
Standard of Appellate Review

Before addressing any of the issues in their appellate brief, defendants urge-this Court that a de novo review is warranted in this case rather than the traditional manifest error/clearly wrong standard of appellate review.
It is well settled that an appellate court may not set aside a trial court’s or a jury’s finding of fact in the absence of manifest error or unless it is clearly wrong. Rosoll v. ESCO, 549 So.2d 840 (La.1989). When one or more legal errors[4] are present, however, the appellate court does not apply the manifest error standard of review but instead conducts a de novo review of the record. Evans v. Lungrin, 97-0541 (La.02/06/98), 708 So.2d 731.
According to defendants, de novo review is appropriate because of legal errors committed by the trial court and jury. Specifically, defendants | aurge that the following were legal errors: the trial court’s refusal to give a requested jury instruction on horseplay and its evidentiary ruling which prohibited defense counsel from showing the entirety of the videotape from the playground on the date of the incident, and the jury’s implicit conclusion that there was a duty on the part of the defendants to investigate.
In this case, the jury instructions, considered as a whole, fairly and reasonably conveyed the issues and provided correct principles of applicable law. As stated by .this. Court in Williams v. Board of Sup’rs of University of Louisiana System, 48,763 (La.App.2d Cir.02/26/14), 135 So.3d 804, 817, writ denied, 14-0666 (La.05/02/14), 138 So.3d 1249, the trial court has á duty to instruct jurors on the law applicable to the cause submitted to them. La. C.C.P. art. 1792(B). The trial judge is under no obligation to give any specific jury instructions that may be submitted by either party; the judge’s duty is to correctly charge the jury. Adams v. Rhodia, Inc., 07-2110 (La.05/21/08), 983 So.2d 798; Simmons v. Christus Schumpert Medical Center, 45,908 (La.App.2d Cir.06/15/11), 71 So.3d 407, writs denied, 11-1592, 11-1591 (La.10/07/11), 71 So.3d 317, 318. Adequate instructions are those which fairly and reasonably point out the issues and provide correct principles of law for the jury to apply to those issues. Id.
Also, the trial court’s exclusion of the videotape from the playground on the date of the incident does not constitute reversible error. In light of the broad discretion given to the trial court in its evidentiary' rulings, see Politz v. Politz, 49,242 (La.App.2d Cir.09/10/14), 149 So.3d 805, 818-19, we do not find a clear abuse of that discretion in the court’s exclusion of the videotape offered on redirect., Furthermore, the tape arguably would not have had any effect on the outcome of the case as it did not contain footage of the incident which forms the basis of this lawsuit, keeping in mind that the jury.did watch those portions depicting the boys involved and their interactions with the duty teacher, Ms. Huckaby.
As to the duty question, the jury answered “yes” to both of the causation questions on' the jury verdict form, the’ jury specifically found that defendants “breached their duty of providing reasonable supervision to J.B.” and “that the breach of providing reasonable supervision was the cause in fact of any foresee *612 able injuries to the plaintiffs.” (Emphasis added).
We thus turn to defendant’s assignments of error.

Liability

A school board, through its agents and teachers, owes a duty of reasonable supervision over students. La. C.C. art. 2320; S.J. v. Lafayette Parish School Board, 09-2195 (La.07/06/10), 41 So.3d 1119; Wallmuth v. Rapides Parish School Board, 01-1779, 01-1780 (La.04/03/02), 813 So.2d 341; Hood v. Ouachita Parish School Board, 45,285 (La.App.2d Cir.06/23/10), 41 So.3d 1253. The supervision required is reasonable, competent supervision appropriate to the age of the children and the attendant circumstances. Id., Doe ex rel. Doe v. DeSoto Parish School Board, 39,779 (La.App.2d Cir.06/29/05), 907 So.2d 275, writ denied, 05-2020 (La.02/10/06), 924 So.2d 167.
^Before liability can be imposed upon a school board for failure to adequately supervise the safety of students, there must be proof of negligence in providing supervision and also proof of a causal connection between the lack of supervision and the accident. Id.; Creekbaum v. Livingston Parish School Board, 11-1089 (La.App.2d Cir.12/21/11), 80 So.3d 771. Before a school board can be found to have breached the duty to adequately supervise the safety of students, the risk of unreasonable injury must be foreseeable, constructively or actually known, and preventable if a requisite degree of supervision had been exercised. S.J., supra; Wallmuth, supra; Hood, supra. In other words, educators are required to exercise only that supervision and discipline expected of a reasonably prudent person under the circumstances at hand. Id.; Adams v. Caddo Parish School Board, 25,370 (La.App.2d Cir.01/19/94), 631 So.2d 70, writ denied, 94-0684 (La.04/29/94), 637 So.2d 466.
Carrie Martin Elementary School Principal Stacy Crawford testified about the school’s policies and procedures specific to bullying and other incidents involving students. The students are instructed to report any problems they have to teachers or administrators, whose responsibility it is to make sure that the children are safe. Once a child reports behavior to a teacher, the student should follow the instructions given to him or her by the teacher. In return, the teacher is never to ignore a child’s report of violence or bullying, but is to investigate immediately. A duty teacher’s assignment is to supervise the children and keep watch for any questionable behavior. hMs. Crawford stated that a teacher’s failure to immediately investigate a reported incident could place a child in needless danger.
Tricia Huckaby, the school librarian, was on duty on the playground at the time of J.B.’s accident. Ms. Huckaby reiterated Ms. Crawford’s testimony that the school’s policies and procedures require a teacher to investigate every reported incident, and that there is no leeway for a teacher to assume a report is bogus, even if a student has made false reports in the past. Ms. Huckaby recited the options available to a teacher to whom a student makes an incident report, which include: questioning the student and getting details; finding out the other student(s) involved; sending the aggressor(s) to the office; closely monitoring the children involved; sending for backup; and/or removing the accused aggressor(s) from the situation.
On December 10, 2012, J.B. reported to Ms. Huckaby that other kids were “messing with” or “bothering” him. Ms. Hucka-by stated that she did not: (1) investigate J.B.’s complaint; (2) speak with the other children allegedly involved; (3) leave the *613 area she was in to walk over to where the children involved were playing; (4) call for backup; or (5) send anyone to the office. She did not see the incident in which J.B. got his arm broken. Ms. Huckaby testified that she did not know that J.B. did anything wrong the day of the incident except that he could have followed her directions and gone to play elsewhere instead of returning to the area where the boys he complained of were playing. In response to a question from plaintiffs’ attorney, Ms. Huckaby clarified her answer by stating that she did not see |7exactly where J.B. went after his report to her, she just saw the direction he was going.
When questioned by defense counsel, Ms. Huckaby stated that J.B.’s demeanor at the time he came up to her to report the other boys was calm; he did not show any signs of being afraid or hurt. J.B.’s presentation, together with her previous experiences with him as an instigator, or a child who was usually trying to get someone else in trouble, led her to discount what he reported that day on the playground. Furthermore, she had no prior knowledge of any violent behavior on the part of the three other boys. Had she known J.B. was actually in danger, she would not have sent him away without investigating his report. Because she saw him walking back toward the boys he had just reported, she figured this was one of those times J.B. was just trying to get other kids in trouble. Given what she knew at the time, Ms. Huckaby felt, that what she did that day was sufficient.
When called on direct by defense counsel, Ms. Huckaby testified that tattling at recess is almost a constant thing on elementary school playgrounds. ■ She had no idea that J.B. was fearful or scared when he came up to her by himself that day at recess.[5] Had she known, she would not have sent him back into a potentially dangerous situation.
B.B., J.B.’s twin brother, testified that they were fourth graders at Carrie Martin Elementary School at the time of the incident. While his Urecess period was before J.B.’s, there was an overlap of about five to ten minutes. As his recess was ending, he saw J.B. come onto the playground. B.B. did not go play with his brother that day. B.B. saw J.B. head over to the jungle gym, where the monkey bars are. B.B. noted that there are two sets of monkey bars on the playground; one is a regular set and one set is in a dome in a jungle gym. Another kid pulled J.B. off the monkey bars, and J.B. went to tell Ms. Huckaby. B.B. was standing against the wall in the same area as Ms. Huckaby, and he heard his brother tell her that the boys were messing with him while he was at the jungle gym. According to B.B., Ms. Huc-kaby told his brother to go play somewhere else, which he did — J.B. went to the regular monkey bars instead of back to the ones in the jungle gym. B.B. saw J.B. get pulled from the second set of monkey bars then pounced on by the same boys who were messing with him before. ■
J.B. testified that at recess on December 10, 2012, he was playing, on the jungle gym, having fun, when three kids came over and started messing with him. These were boys he had problems with previously. When the three boys, A, W and J, pulled him off the monkey bars that day, he went to tell Ms. Huckaby. She was on *614 the asphalt talking to other teachers on duty. When J.B. told her that the other kids were messing with him, Ms. Huckaby did not ask any questions, she just told him to go play somewhere else, which he did. The boys walked over to him, and as J.B. started walking back toward Ms. Huc-kaby, they grabbed him by his hood and threw him down. J.B. could see Ms. Huc-kaby from where he was, still talking to the other teachers. J.B. got back up to continue toward Ms. Huckaby, but he 19was tackled again, for a total of about five times. Because he was not fast enough getting up the last time, when one of the boys jumped on him, it broke his arm.
Daisy Brammer testified that throughout the fall of 2012, her boys, B.B. and J.B., had come home complaining of being picked on at school. These incidents always seemed to involve the same few boys. According to Mrs. Brammer, she reported these incidents to Ms. Koeppen, the vice principal. Mrs. Brammer stated that they had always taught their boys that whenever they had a problem to find an adult and tell them about it rather than defend themselves, which would only get them in trouble.
Principal Crawford testified that immediately upon learning of the incident, she talked to Ms. Huckaby, the teacher on duty, and learned that J.B. was tackled and his arm broken. Ms. Huckaby related to her that prior to that, the children had been bothering each other on the playground, and that J.B. had reported this behavior to her before the incident in which his arm was broken. Plaintiffs’ counsel asked Ms. Crawford whether, if the facts showed that J.B. had told Ms. Huckaby that the boys were bothering him but she failed to do anything, such as investigate, and these boys broke J.B.’s arm, would that be considered a failure to properly investigate and prevent an accident, the principal’s response was “yes.” Ms. Crawford then stated that none of the boys involved had consistent stories about what happened, although she did learn through her investigation that J.B. was not at fault for the incident.
| inMs. Crawford also testified that, based upon what she learned during her investigation, Ms. Huckaby’s actions were reasonable and not violative of any policies or procedures. Ms. Crawford stated that pri- or to J.B.’s injury on December 10, 2012, she had two separate encounters with him about incidents he was involved in; both times, J.B. lied to her, once even after being confronted with video evidence of his participation in an incident that occurred on a school bus. Ms. Huckaby also had a history with J.B. and his inability or unwillingness to tell the truth about incidents that happened in the library. Ms. Hucka-by related to Ms. Crawford that as librarian, she was present, so she knew that J.B. was being untruthful when he would tattle or try to get others in trouble for things that did not occur.
Ms. Crawford did not think it was foreseeable that J.B. would sustain a broken arm that day. When asked whether the incident was captured on videotape, Ms. Crawford testified that there are no cameras covering the jungle gym area so the accident was not captured or preserved on videotape.
Although Louisiana jurisprudence holds that a school board is not the insurer of the safety of school children, liability will be imposed where there is a causal connection between the lack of supervision and an incident which could have been avoided by the exercise of a reasonable degree of supervision. Doe ex rel. Doe, supra. As noted above, the requisite supervision is reasonable, competent supervision appropriate to the age of the children *615 and the circumstances. S.J., supra; Wall-m/uth, supra.
 In the instant case, during recess, a tumultuous time on any elementary school playground, J.B. reported to the duty teacher, Ms. hi Huckaby, that other boys were “messing” with or “bothering” him. School policy required her to, at the very least, question J.B. about his complaint, something she did not do. Instead, because of past experiences with J.B. and her opinion that J.B. was a tattletale and a troublemaker, Ms. Huckaby did nothing. Minutes later, J.B. was injured by the very same boys he had gone to talk to Ms. Huckaby about. We cannot say that the jury was manifestly erroneous or clearly wrong in its determination that defendants breached their duty of reasonable supervision and that but for this breach J.B.’s injury would not have occurred.

Comparative Fault

The jury in this case was given the opportunity to assess comparative fault and they decided to place 100% of the fault on defendants. We find in this case that an allocation of fault to the fourth grade boys, including J.B., who were involved in the playground incident that is the basis for this suit would be inappropriate under La. C.C. art. 2820. In both Doe ex rel. Doe, 907 So.2d at 288, and Vaughn ex rel. Vaughn v. Orleans Parish School Board, 01-0556 (La.App. 4th Cir.11/28/01), 802 So.2d 967, writ denied, 02-0005 (La.06/07/02), 818 So.2d 773, as in the instant case, it was stipulated that -the educators involved were acting in the course and scope of their employment with the defendant school boards at the time that the incidents (sexual assaults in both Doe and Vaughn and a playground accident in this case) occurred. Likewise, in all three cases the fact finders concluded that the teachers breached the duty of reasonable supervision owed to the students who were injured and that the breaches were the cause |12of the students’ harm. In this negligent supervision case, an allocation of fault to J.B. or the other elementary school boys involved would not be appropriate as it would not have a practical effect in light of the teacher’s statutory responsibility for the fault of her students pursuant to La. C.C. art. 2320.

Quantum

Defendants have appealed as excessive the jury’s award to J.B. of general damages in the amount of $125,000 and its award to Mrs. Brammer of $25,000 for loss of consortium.

General Damages

General damages are those which may not be fixed with pecuniary exactitude; instead, they involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or lifestyle which cannot be definitely measured in monetary terms. Bellard v. American Central Insurance Co., 07-1335 (La.04/18/08), 980 So.2d 654; Swayze v. State Farm Mutual Auto. Insurance Co., 49,079 (La.App.2d Cir.10/21/15), 184 So.3d 81, 2015 WL 6160646; Young v. Marsh, 49,496 (La.App.2d Cir.11/19/14), 153 So.3d 1245; Caskey v. Merrick Construction Co., Inc., 46,886 (La.App.2d Cir.03/14/12), 86 So.3d 186, writ denied, 12-0847 (La.06/01/12), 90 So.3d 442.
In the assessment of damages in cases of offenses, quasi offenses and quasi contracts, much discretion is left to the judge or jury. La. C.C. art. .2324.1. The discretion vested in the trier of fact is “great,” and even vast, | 13so that an appellate court should rarely disturb an award of general damages. Zimmerman v. Progressive Security Insurance Co., 49,982 *616 (La.App.2d Cir.08/12/15), 174 So.3d 1230; LeBlanc v. Pynes, 46,393 (La.App.2d Cir.07/13/11), 69 So.3d 1273, writ denied, 11-1792 (La.10/14/11), 74 So.3d 213. The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Id.
J.B. testified that his arm got hurt the last time the boys jumped on him that day on the playground. He could not get up or move his left arm, so he stayed on the ground for several minutes until one of the duty teachers, not Ms. Huckaby, came to check on him. They took him to the principal’s office, and from there he went to the hospital. J.B. testified that he still has occasional pain in his left arm and shoulder, usually in the joint due to overuse.
Dr. John Mays, who specializes in orthopedics and sports medicine, was J.B.’s treating physician. Upon examination on December 10, 2012, Dr. Mays noted that J.B.’s shoulder was extremely swollen. An x-ray confirmed that J.B. had sustained a fractured proximal humerus with pretty severe displacement. The fracture was a jagged one, with a sharp bone spike sticking into J.B.’s deltoid muscle, causing limited motion and extreme pain, as well as displacement of the other bone pieces and soft tissues. Dr. Mays characterized the break as a relatively rare and painful injury. As an atypical fracture, i.e. severe and close to a joint, it could be painful for months, years, maybe forever.
|uDr. Mays stated that in order to repair the fracture with a closed reduction and internal fixation, he had to sedate J.B. and paralyze his muscles. Two pins were inserted into J.B.’s shoulder to hold the fractured bone in position as it healed. Dr. Mays used externally protruding pins so he would not have to put J.B. under anesthesia again to remove the pins once the fracture began healing. The pins remained for three to four weeks, and J.B. had open wounds where the pins exited his skin. The open wounds continued to ooze fluids and had to be kept clean while the pins remained.
J.B. was released to go home on Decem'ber 11, 2012, with care instructions to clean the open wounds with peroxide twice a day, wear a sling and limit his activity. J.B. returned to Dr. Mays on January 25, 2013, approximately six weeks post-accident. J.B. had good range of motion and reported no pain. His next visit with Dr. Mays was on February 25, 2013, and J.B. had full range of motion in his left shoulder and arm. , Thereafter, Dr. Mays did not see J.B. again until June 6, 2014. J.B. reported occasional mild shoulder pain, and Dr. Mays observed full range of motion and strength. The fracture was well healed with good alignment and no growth plate abnormalities. Dr. Mays told J.B. that he would have residual discomfort from the break which could take years, if ever, to resolve, although future surgery or intervention was unlikely.
Mrs. Brammer testified that her son has changed since the injury to his arm. He has trouble doing things he could do easily before, such as holding his violin. He also used to bé animated and outgoing, but now is nervous and more withdrawn.
| isThe jury awarded J.B. a single amount for non-itemized general damages. However, the jurors were instructed to consider past and present pain and suffering, inconvenience and mental distress in their calculation of the award. J.B., a nine-year-old child at the time of his injury, experienced a rare and severe fracture in his arm. He missed out on enjoying the holiday season with his family following his *617 accident as he was recovering from surgery. Furthermore, according to Mrs.
Brammer, J.B. has undergone mental anguish and stress that continue to affect him. In light of the vast discretion given to the jury in making an award of general damages, although on the high side, we cannot say that this jury’s general damage award of $125,000 is an abuse of its discretion.

Loss of Consortium

A parent’s loss of consortium claim includes damages for: (1) loss of love and affection, (2) loss of society and companionship, (3) loss of performance of material services, (4) loss of financial support, (5) loss of aid and assistance, and (6) loss of fidelity. Doe ex rel. Doe, supra.
Damages for loss of consortium are general damages, the assessment of which the fact finder is given much discretion. La. C.C. art. 2324.1; Young, supra; McNeill v. Landstar Ranger, Inc., 43,362 (La.App.2d Cir.06/11/08), 986 So.2d 905, writ denied, 08-1558 (La.10/10/08), 993 So.2d 1287; Etheredge v. St. Paul Mercury Insurance Co., 35,832 (La.App.2d Cir.04/03/02), 814 So.2d 119.
Mrs. Brammer testified that she and her husband spent the night with J.B. at the hospital before his surgery and remained with him until the time |lsfor his operation. Dr. Mays told them that the surgery had gone well and they could take J.B. home. Mrs. Brammer stated that she took care of J.B. according to Dr. Mays’ instructions. She changed bandages three times a day, something that was very painful for J.B. because of the pins and open wounds. For several weeks, J.B. could not do anything on his own. He was unable to use the bathroom without assistance, and his twin brother, B.B., helped him. J.B. had to have assistance with showering, and B.B. and their older sister helped Mrs. Brammer wash his hair in the sink. Mrs. Brammer stated that she stayed home with him every day, giving him pain medication and keeping him as comfortable as she could. Mrs. Brammer testified that the two years .since the accident has been tough on her children, and she suffers from stress as she tries to help J.B. recover emotionally from this incident. It is her fear that J.B. will either be a victim his whole life or bully others. As a mother, Mrs. Brammer feels she has a duty to make J.B. feel secure.
'In light of the above, we cannot say that the jury’s award of $25,000 to Mrs. Bram-mer for loss of consortium is an abuse of its discretion.

Conclusion

For the reasons set forth above, the judgment of the trial court entered in accord with the jury’s verdict is AFFIRMED.

. Defendants answered the petition and demanded a trial by jury. They also filed third party and reconventional demands, The third party demand was dismissed and the recon-ventional demand was not pursued. We note that both relate to the issue raised by the no right of action filed in this Court.

. 'By Act No. 260 of the 2015 Legislative Session, the Legislature undertook a massive revision of those portions of the Civil Code, Code of Civil Procedure, and Revised Statutes related to parental authority, the obligations of children, parents and other ascendants, and provisional custody by mandate. As part of this revision, La. C.C. art. 220 has been repealed.

.See La. C.C. art. 221, La. C.C. art. 222 (2015), La. C.C.P. art. 683.

. A legal error occurs when a trial court prejudicially applies incorrect principles of law such that it materially affects the outcome of the case and deprives a party of substantial rights. Lasha v. Oliri Corp., 625 So.2d 1002 (La.1993).

. Apparently J.B. and the other boys, J, W and A, as a group approached Ms. Huckaby to tattle on each other that day at recess before J.B. went to talk to her alone. Ms. Huckaby talked to the four boys and as she was doing so, J.B. walked away without staying to hear what she had to say, which was to stay away from each other if they could not all get along.