WILLIAMS, C.J.
The plaintiffs, Karen C. Jones and Calvin R. Jones, appeal a trial court judgment which they claim awarded insufficient damages for Karen's injuries resulting from an automobile accident and for Calvin's claim for loss of consortium. The plaintiffs also appeal the trial court's application of Texas law in calculating medical expenses. For the following reasons, we affirm.
*663 FACTS
On October 23, 2013, the plaintiff, Karen C. Jones, a resident of the State of Texas, drove to Shreveport, Louisiana to attend a work-related training session at Willis-Knighton Medical Center. She was stopped at a traffic light at the intersection of Interstate 20 and Greenwood Road. James A. Frith was stopped behind Karen's vehicle when he was rear-ended by a vehicle being driven by Sarah L. Coleman. The collision caused Frith's vehicle to slide into the rear of Karen's vehicle.
At the time of the accident, the vehicle being driven by Coleman was covered by an automobile insurance policy issued and delivered by Foremost Insurance Company; Frith was insured by Financial Indemnity Company; Karen had an uninsured/underinsured motorist insurance policy that was issued by Farmers Texas County Mutual Insurance Company ("Farmers"). Karen's policy was negotiated, issued and delivered in the State of Texas.
Following the accident, Karen, who was 56 years old, drove herself to the emergency room at Willis-Knighton with complaints of pain in her neck and lower back. After being diagnosed with cervical and lumbar strain, Karen was released with prescriptions for a muscle relaxer and pain medication and she was given instructions to follow up with her physician. Thereafter, Karen drove herself back to her home near Dallas, Texas.
Karen had a preexisting back condition due, in part, to injuries she sustained in an automobile accident in 2004. As a result of the injuries from the 2004 accident, Karen underwent a lumber spinal fusion at the L5-S1 level in 2005.
Following the October 2013 accident, Karen was seen by Dr. Richard Marks, her prior back surgeon, on three occasions - November 5, 2013, December 17, 2013, and January 28, 2014 - during which she primarily complained of neck pain. At that time, Dr. Marks noted that Karen's back condition had not changed, with the exception of some degenerative changes, since her post-operative radiological studies in 2006. After receiving conservative treatment, such as oral medication and physical therapy for muscle strengthening, Karen did not return to Dr. Marks' office until February 2016, more than two years after the accident.
On October 7, 2014, Karen filed a lawsuit naming Frith and his insurer, Coleman and her insurer, and Farmers as defendants. Karen alleged that she sustained injuries to her neck and back as a result of the automobile accident. Karen's husband, Calvin Jones, joined the lawsuit claiming loss of consortium. Subsequently, Karen settled her claims with Coleman and her insurer; Frith and his insurer were dismissed from the lawsuit on a motion for summary judgment.[1] The matter proceeded with Farmers, Karen's UM insurer, as the sole defendant.
Subsequently, on July 11, 2017, Farmers filed a motion in limine arguing that the calculation of Karen's medical expenses should be governed by Texas law. Farmers maintained that the policy was issued in Texas to a resident of Texas, and all of Karen's medical treatment (with the exception of the initial emergency room visit) was provided in Texas. Therefore, according to Farmers, the Texas "paid-not-incurred" rule should apply. The trial court granted the motion, concluding that Karen's medical expenses were governed by Texas law.
A bench trial was conducted on January 18, 2018. On the morning of trial, the *664 parties stipulated that Karen's medical expenses through January 28, 2014, totaled $7,593.05, and the expenses incurred thereafter totaled $138,854.86.
As stated above, the evidence adduced at trial established that Karen had injured her back in a previous automobile accident in 2004, and she had undergone a lumbar fusion at L5-S1 as a result of that accident. Following the October 2013 accident, Karen was seen by Dr. Richard Marks, her prior back surgeon on three occasions - November 5, 2013, December 17, 2013, and January 28, 2014.[2] During the first visit, Dr. Marks noted that Karen's back problems were unchanged since 2006. After the three visits to Dr. Marks, Karen did not seek any further treatment for neck and back pain until February 2016.
Karen testified her neck and back pain never resolved and that it had "always been there since the wreck." She explained that she "just lived with [the pain]." According to Karen, she decided to return to Dr. Marks' office when the pain became so "excruciating," that she "could not stand it anymore," and it became difficult to "be normal in any form or fashion." Further, Karen testified that she did not seek medical treatment between January 2014 and February 2016 because she was afraid of having to deal with employment issues.[3]
On cross-examination, Karen testified as follows: the impact from the collision did not cause the airbags in her vehicle to deploy; the photographs depicted minor damage to her vehicle; after the accident, she had difficulty closing the liftgate on her SUV; she did not miss any days from work as a result of the accident; Dr. Marks did not restrict her activities after the accident; she continued to drive around in the Dallas-Fort Worth area doing her job in medical devices/equipment sales; she did not seek medical treatment for her neck or her back between January 2014 and February 2016; and during her deposition in February 2016, she described her pain as "tolerable."
Further, on cross-examination, Karen admitted that according to Dr. Marks' notes from her November 2013 visit, she described her right low back and upper gluteal pain was "mild to moderate." She also admitted that Dr. Marks noted that her back pain was unchanged from before the October 2013 accident; and when she returned to Dr. Marks in February 2016, he noted that she reported "severe" left gluteal pain.
Calvin Jones, Karen's husband, testified as follows: immediately after the accident, he did not notice "anything too much out of the ordinary other than [Karen] was *665 kind of sore and everything like that"; as time passed, he began to notice that Karen was "sleeping more restless" and she had become less active; he "put two and two together" and concluded that Karen was experiencing back pain based on his own prior issues with back pain and lumbar surgery;[4] after he began to question Karen, she admitted that she was having back pain; after the October 2013 accident, Karen stopped doing activities she had enjoyed, such as gardening, going to the movies and attending baseball games; and he was forced to sell his boat because it was "too hard for [Karen] to get on and off the boat" and she could not tolerate being on the boat "unless the lake was absolutely glass smooth."
Dr. Marks testified via a videotaped deposition.[5] Dr. Marks testified as follows: he had known Karen and Calvin for a number of years; he performed lumbar fusions on Karen and Calvin in the past; Karen "did very well" after her surgery in 2005; when he examined Karen in December 2013, her primary complaint was neck pain and stiffness; Karen reported that she had fallen and broken her ankle; and in December 2013, Karen "felt that her back hadn't really changed significantly" since 2006. Dr. Marks further testified that he ordered additional X-rays. With regard to those X-rays, Dr. Marks testified as follows:
No real change. And no real change not only from what had previously been done, but apparently these were compared to what was done a long time ago, six years previously, and it looked really quite similar. So nothing that looked acute. I was concerned not only about what may have happened with this fall, did she make anything worse. It didn't appear to. Her symptoms were worse, but X-rays wise, nothing was worse.
Additionally, according to Dr. Marks' notes, Karen did not complain of back pain when she was examined by him in January 2014. Karen did not return to Dr. Marks until February 2016, at which time she complained of "severe" pain in her lower back. After several visits and diagnostic testing, Dr. Marks recommended that Karen undergo a two-level fusion (L3-4 and L4-5) to improve her symptoms. He also opined that the October 2013 automobile accident "exacerbated Karen's preexisting neck issues and caused new issues." Dr. Marks also testified that he believes the treatment he provided to Karen for her back issues "are definitely related to the [October 2013] wreck." Further, Dr. Marks testified that he believes the accident was a substantial factor in causing Karen's need for back surgery and that the accident was a substantial factor in causing Karen's neck problems.
On cross-examination, Dr. Marks testified as follows: he did not mention back surgery to Karen when he saw her in January 2014; he does not know what, if anything, may have happened to Karen between her January 2014 visit and her February 2016 visit to cause her increased pain; his notes from Karen's January 2014 examination do not contain any reference to back pain; in January 2014, there was no indication, from either diagnostic testing or Karen's subjective complaints, that she would require a two-level fusion; during Karen's initial visit to him in November 2014, her X-rays showed that the level of instability at L4-5 was unchanged from her 2006 medical records; one of the risks of a spinal fusion is that more stress is placed on the levels above the site of the *666 fusion; in January 2014, Karen's neck X-rays showed degenerative changes, which were unchanged from her 2006 X-rays; during the two-year gap in Karen's medical treatment, he does not know whether or not she was taking pain medication or receiving treatment from other physicians; and during his treatment of Karen from February 2016 to March 2017, her neck pain was secondary to her back pain.
Dr. Britain Auer, an orthopedic surgeon, also testified via a videotaped deposition.[6] Dr. Auer testified that he conducted an independent medical examination of Karen on February 9, 2017. He stated that Karen reported to him that she initially experienced neck pain after the accident, and her back pain began approximately one month after the accident. Dr. Auer stated that Karen also reported that her "neck was doing pretty well" and that "she was not interested in any - in having surgery on her neck."
Furthermore, Dr. Auer testified that he agrees with Dr. Marks that Karen needs lumbar surgery. However, he opined that Karen's current back condition and her need for surgery are unrelated to the October 2013 automobile accident. Dr. Auer testified as follows:
[Karen] readily volunteered to me on her history that she didn't have any back pain for a month [following the October 2013 accident]; which I would say is unusual. You know, generally, with respect to the trauma, if a traumatic event is going to cause you symptoms, it will do so within - with - with low back pain within 24 to 48 hours. And she volunteered. I did not ask. I did not prompt. She said: "It didn't really bother me for about a month and then I started having back pain."
So that is one factor that would tell me that the trauma does not necessarily have anything to do with her ongoing symptoms. And then also gaps in treatment. If your back pain started hurting after a month, it does not appear to me from the medical records, unless there are other records I'm not aware of, that she sought any treatment for at least two years. If you go two years doing pretty well, it's pretty difficult for me to connect that to an incident two years ago that is traumatic.
* * *
[I]f it [was] related [to the traumatic event], it would have resulted in ongoing treatment. And sometimes in patients, I mean, they go to a chiropractor, or they go to physical therapy, or go see the doctor and get some medications, but I - from what I've been presented, I see evidence of nothing for - I don't know exactly how many months it is, but at least two years before there were any complaints to her prior surgeon who operated on her, had a relationship with her, and didn't - she just didn't go back. So you would think if you were having a significant amount of pain, you would go back.
Further, Dr. Auer testified that Karen's statements to him corroborated her statements to Dr. Marks in November 2013, i.e. , that her back pain was unchanged from 2006. He opined that Karen's failure to seek medical treatment between January 2014 and February 2016 more than likely means that her low back pain was not severe enough to warrant further medical treatment. He explained as follows:
[S]he did well for a couple of years. And lots of things can happen in a couple of years. She has a very degenerative neck on her MRI, which is genetic, *667 not accident related. And if you do well for two years and then you start having pain, it's more likely, in my opinion, due to your degenerative condition that you were born with and were going to develop than it is from trauma.
On cross-examination, Dr. Auer testified as follows: he reviewed Karen's medical records from Dr. Marks, her post-accident MRI studies, and a CT scan of her cervical spine; he examined Karen in February 2017; Karen "absolutely" had back pain when he examined her in 2017; people who have had a lumbar surgery and people with degenerative spine conditions are more likely to become injured in traumatic events such as automobile collisions; Karen's emergency room records show that she complained of neck pain and low back pain immediately after the collision; the fact that Karen complained of low back pain immediately after the accident does not change his opinion that her current back condition is not related to the accident; and he believes Karen's neck issues are related to the accident "to a certain extent."
After reviewing the evidence, the trial court noted that the damage to Karen's vehicle was "very minor and not visible upon examination without removing the bumper[.]" The court also noted Dr. Marks' admission that Karen's X-rays "both before the motor vehicle accident of October 2013 and after were basically the same albeit with some degenerative conditions present." The trial court concluded that "any back complaints that [Karen] had after January 28, 2014, are more probabl[e] than not related to her pre-existing condition rather than the October 2013 motor vehicle accident." With regard to the injuries to Karen's neck, the trial court stated:
[T]here has been no medical testimony which states that the treatment and complaints after January 28, 2014 are not related to the motor vehicle accident of October 2013. Dr. Marks and Dr. Auer related at least part of her neck problems to the motor vehicle accident of October 2013. Although there was a very long gap in treatment, January 28, 2014 until February 23, 2016, which this Court believes is an extremely long time to go without medical treatment for a condition in which a Plaintiff complains is bothering her on an ongoing bases [sic], the Court does acknowledge the fact that both medical experts testified that her neck complaints are related to the motor vehicle [accident] in question.
The court awarded to Karen damages as follows:
*668 General Damages $22,500.00 Stipulated Medical Expenses (until January 28, 2014) $7,593.05 Medical Expenses for Neck treatment after January 28, 2014 $6,006.79 TOTAL AWARD $36,099.84
The court stated, "The above medical figures after January 28, 2014 are for neck issues only and not for low back treatment after January 28, 2014." Further, the court awarded Karen's husband damages in the amount of $1,500 for loss of consortium.
The plaintiffs now appeal.
DISCUSSION
Karen contends the trial court erred in finding that her lower back problems after January 2014 were not related to the October 2013 automobile accident. She maintains that the October 2013 accident aggravated her preexisting back condition because she "did well" from the time she recovered from her surgery until the accident. According to Karen, the fact that she did not have to undergo any X-rays or medical treatment for her back between 2006 and the October 2013 accident proves that the accident caused all of her current back problems. Further, Karen asserts that Dr. Marks' opinion that all of her neck and lower back problems are related to the accident is entitled to greater weight.
An appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Cole v. State Dept. of Public Safety & Corr. , 2001-2123 (La. 9/4/02), 825 So.2d 1134 ; Stobart v. State through Dept. of Transp. & Dev. , 617 So.2d 880 (La. 1993) ; Jewitt v. Alvarez , 50,083 (La. App. 2 Cir. 9/30/15), 179 So.3d 645. Our jurisprudence summarizes the manifest error/clearly wrong standard of review as follows:
To reverse a factfinder's determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart , supra ; Jewitt , supra .
Even if an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Cole , supra ; Rosell v. ESCO , 549 So.2d 840 (La. 1989). Moreover, where the factfinder's conclusions are based on determinations regarding credibility of the witnesses, the manifest error standard demands great *669 deference to the trier of fact because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell , supra ; Jewitt , supra .
In the instant case, our review of Karen's medical records reveals that she presented to the emergency room soon after the automobile collision. She complained of pain in her lower back and neck and was diagnosed with muscle strain. Karen was discharged with prescriptions for pain medication and a muscle relaxer, and she was instructed to follow up with her physician. The medical records also reveal that on November 5, 2013, approximately two weeks after the accident, Karen presented to Dr. Marks complaining of neck pain. According to Dr. Marks' progress notes, Karen reported that she experienced "immediate neck pain" after the accident and that she had "no exacerbation of low back pain." Further, Dr. Marks' notes provided:
* * *
As regard to her low back, she continues with mild to moderate right lower back and upper gluteal pain. This, however, is unchanged from what she had noted prior to the motor vehicle accident in this status post 360 fusion patient.
* * *
Given that there is no change in her lumbar symptoms, no specific lumbar evaluation is done today.
* * *
With regard to Karen's radiological studies, Dr. Marks noted some degenerative changes in her back and neck which he felt did not appear to be related to the October 2013 automobile accident. Dr. Marks also noted as follows:
* * *
Presently, we are not getting further study such as an MRI of the lumbar spine as she feels that the symptoms in the low back are quite comparable to what was present prior to the motor vehicle accident. If, however, the symptoms in the low back fail to abate, we would look into this area as well.
* * *
Karen's medical records also reveal that she returned to Dr. Marks on December 17, 2013.[7] Dr. Marks discussed his observations and recommendations for treatment with regard to Karen's neck; however, he did not make any notations regarding any complaints about her back, other than recommending physical therapy to stretch and strengthen her neck, back and gluteal muscles.
Further, the medical records reveal that Karen returned to Dr. Marks on January 28, 2014, complaining of pain in her neck, headache, dizziness and difficulty maintaining her balance. Dr. Marks noted that Karen's cervical X-rays taken that day did not reveal any significant changes from those taken six years prior, other than some "anticipated progression" of the degenerative condition in her cervical spine. Dr. Marks also noted that there were no changes in the obliques "other than again what might be considered a natural progression over a period of years." Dr. Marks' progress notes from that visit do not contain any notations with regard to back pain.
Thereafter, Karen did not return to Dr. Marks' office until February 23, 2016, when she complained of "severe right gluteal pain."[8] A subsequent MRI of Karen's *670 lumbar spine revealed that she had an "approximately 3-mm bulge at the 4-5 level" and a "2 to 2.5-mm disc bulge at L3-4[.]"
The medical records from the visits to Dr. Marks soon after the October 2013 accident revealed that Karen's back condition was degenerative in nature and was unchanged since her X-rays in 2006. Nevertheless, Dr. Marks testified that Karen's back problems were caused by the October 2013 automobile accident. Contrarily, Dr. Auer opined that Karen's back issues were unrelated to the accident.
The trial court noted the minor impact between the vehicles involved in the collision and the inconsequential damage sustained by the vehicles. The court also noted the complaints made by Karen during her visits to Dr. Marks in November 2013, December 2013 and January 2014. Further, the court noted the opinions of both medical experts in this matter. It is apparent from the court's ruling that it found Dr. Auer's testimony, with regard to the cause of Karen's back problems, to be credible. The court reviewed the evidence of record and concluded that Karen's back complaints, after January 2014, were not related to the October 2013 automobile accident. Based on our review of the record in this case, we find that a reasonable factual basis exists to support the trial court's findings. The trial court's determinations are not manifestly erroneous or clearly wrong. This assignment lacks merit.
The plaintiffs also contend the trial court erred in failing to award Karen a "reasonable amount" in general damages. Karen argues that the amount awarded, $22,500, was abusively low and should be increased because the evidence shows that the accident caused the injuries for which she has required medical treatment for at least four years. She maintains that she continues to suffer from neck and back pain as a result of the injuries she sustained in the accident, and Dr. Marks has recommended that she undergo a two-level spinal fusion due to her injuries. Karen asserts that even if this Court finds that her back problems are unrelated to the accident, the award is woefully inadequate to compensate her for "continuous neck pain." Citing Melancon v. Lafayette Ins. Co. , 2005-762 (La. App. 3 Cir. 3/29/06), 926 So.2d 693 ; Stapleton v. Great Lakes Chem. Corp. , 24,386 (La. App. 2 Cir. 5/4/94), 639 So.2d 300 ; Hall v. Folger Coffee Co. , 2002-0920, 2002-0921 (La. App. 4 Cir. 10/1/03), 857 So.2d 1234 ; Gray Ins. Co. v. Hunter , 1999-0497 (La. App. 4 Cir. 9/22/99), 752 So.2d 200 ; and Andrews v. Mosely Well Serv., 514 So. 2d 491 (La. App. 3 Cir.), writ denied, 515 So. 2d 807 (La. 1987), Karen argues that she should have been awarded at least $400,000-$500,000 in general damages.
One damaged through the fault of another is entitled to full indemnification for the damages caused thereby. La. C.C. art. 2315 ; Wainwright v. Fontenot , 2000-0492 (La. 10/17/00), 774 So.2d 70. General damages are those which may not be fixed with pecuniary exactitude; instead, they involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of lifestyle which cannot be definitely measured in monetary terms. Bellard v. American Cent. Ins. Co. , 2007-1335 (La. 4/18/08), 980 So.2d 654. The trier of fact has much discretion in the assessment of general damages.
*671 La. C.C. art. 2324.1. The role of the appellate court in reviewing general damage awards is not to decide what is an appropriate award, but to review the exercise of discretion by the trial court. Wainwright , supra .
As stated above, in the instant case, the trial court awarded damages to Karen "[b]ased upon the medical testimony, evidence of a very minor impact between the vehicles, testimony of the Plaintiff and her husband, the preexisting conditions of Plaintiff, radiographic films, prior medical treatment, the lack of missing work as well as the long gap in treatment[.]" The court noted that, with the exception of a period of time during which she changed jobs, Karen continued to work every day after the accident, performing her employment duties in medical sales throughout the Dallas/Fort Worth area.
As stated above, the medical records established that Karen sought treatment on three occasions after the accident, primarily complaining of pain in her neck. Karen did not return to Dr. Marks until two years later, with complaints of increased back pain and little mention of neck pain. At the time of Dr. Marks' deposition, he was not providing treatment to Karen for any neck complaints. Based on our review of this record, we find that the trial court did not abuse its great discretion in awarding general damages to Karen in the amount of $22,500. This assignment lacks merit.
Karen further argues that the trial court erred in failing to award to her damages sufficient to cover the "full amount of her past medical expenses." According to Karen, the court legally erred in finding that Texas' "paid-not-incurred" law applied to the calculation of her medical expenses.
Louisiana's choice-of-law rules are set forth in La. C.C. arts. 3515 et seq. La. C.C. art. 3515 provides:
Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.
In Champagne v. Ward , 2003-3211 (La. 1/19/05), 893 So.2d 773, the Louisiana Supreme Court stated that the appropriate starting point in a multistate case is to determine if there is a difference between Louisiana's law and the law of the foreign state. If so, courts should conduct a choice of law analysis, as set forth in La. C.C. art. 3515 et seq ., to determine which state's law applies.
Louisiana law and Texas law differ with regard to the amount of special damages recoverable for medical expenses. Under Louisiana law, one injured through the fault of another is entitled to full indemnification for damages caused thereby. Wainwright , supra ; Caskey v. Merrick Const. Co., Inc. , 46,886 (La. App. 2 Cir. 3/14/12), 86 So.3d 186, writ denied , 2012-0847 (La. 6/1/12), 90 So.3d 442. Further, Louisiana's collateral source rule provides that a tortfeasor may not benefit, and an injured plaintiff's recovery may not be reduced, because of monies received by the plaintiff from any sources independent of the tortfeasor's procuration or contribution.
*672 Bozeman v. State , 2003-1016 (La. 7/2/04), 879 So.2d 692 ; Louisiana Dept. of Transp. & Dev. v. Kansas City Southern Ry. Co. , 2002-2349 (La. 5/20/03), 846 So.2d 734. Thus, under Louisiana law, payments received from the independent source are not deducted from the award the plaintiff would otherwise receive from the tortfeasor. Bozeman , supra .
Contrarily, under Texas law, "recovery of medical or health care expenses incurred is limited to the amount actually paid or incurred by or on behalf of the claimant." TX CIV PRAC & REM., § 41.0105.[9] Thus, under Texas law, the recovery of damages for Karen's medical bills is limited to only those that have actually been paid or are actually owed, rather than those that have been incurred, billed or invoiced.[10] Consequently, we are compelled to conduct a choice of law analysis to determine whether the Texas "paid-not-incurred" law applies under the facts of this case.
Our review of this record revealed the following contacts with the State of Louisiana:
1. The accident occurred in Shreveport, Louisiana;
*673 2. Coleman, who caused the accident, is a resident and domiciliary of Louisiana;
3. Coleman's automobile insurance policy was issued to her in Louisiana;
4. Coleman is no longer a party in this matter; and
5. Immediately after the accident, Karen received treatment in the emergency room in Louisiana.
Karen's contacts in Texas include the following:
1. Karen is a resident and domiciliary of Texas;
2. Karen's UM insurance policy was formed and issued in Texas;
3. The vehicle on which Karen purchased coverage is registered in Texas;
4. The sole parties remaining in this matter are the plaintiffs, who are residents of Texas, and the UM insurer;
5. With the exception of the initial emergency room visit, all of the medical care rendered to Karen as a result of the accident was provided in Texas; and
6. With the exception of the initial emergency room charges, all of Karen's medical expenses were incurred in Texas.
Under the facts of this case, we find that Texas has a more substantial interest in the application of its laws governing the recovery of medical expenses than Louisiana has in providing a remedy to an out-of-state resident, who was injured while transitorily within the borders of Louisiana, but incurred virtually all of her medical expenses in Texas. Accordingly, we find the trial court did not err in concluding that Texas law applied to the calculation of medical expenses in this case.
Additionally, Karen contends the trial court erred in failing to award damages for future medical expenses. She argues that the medical testimony indicates, and the trial court found, that her neck injuries were caused by the accident. According to Karen, she will require cervical injections for her neck pain for the rest of her life. Karen also asserts that based on the average life expectancy of a woman her age, if she receives one cervical injection per year, damages for her future medical expenses for her neck injury would exceed $97,000. She also argues that she is entitled to damages for future medical expenses for her back surgery.[11]
To recover the cost of future medical expenses, a tort victim must establish the probability of such expenses with supporting medical testimony and estimations of their probable cost. Menard v. Lafayette Ins. Co. , 2009-1869 (La. 3/16/10), 31 So.3d 996. The proper standard for determining whether a plaintiff is entitled to future medical expenses is proof by a preponderance of the evidence that those expenses will be medically necessary. Menard , supra ; Terry v. Simmons , 51,200 (La. App. 2 Cir. 2/15/17), 215 So.3d 410.
An award for future medical expenses is by nature highly speculative and not susceptible to calculation with mathematical certainty. When the record establishes that future medical expenses will be necessary, the court should not reject such an award on the basis that the record does not provide the exact value of *674 the necessary expenses if the court can determine from the evidence in the record a minimum amount that reasonable minds could not disagree will be required. Menard , supra . In reviewing a factual finding regarding special damages, the issue is whether the trial court's conclusion was reasonable in light of the record as a whole. Menard , supra ; Rosell , supra .
In this case, Karen testified that she continues to have neck pain that prevents her from doing activities that she once enjoyed. Dr. Marks and Dr. Auer testified that Karen is not a candidate for neck surgery. Dr. Marks testified that by March 2017, Karen's neck pain was secondary to her back pain. With regard to future medical treatment for Karen's neck, Dr. Marks testified that she could benefit from epidural steroid injections approximately three times per year; however, he was unable to say how many years Karen might receive the injections.
Dr. Auer testified that when he examined Karen in February 2017, she reported to him that her "neck was doing pretty well[.]" Dr. Auer testified that "periodically, [Karen] may benefit from physical therapy [and] [s]he could benefit from injections." He stated that if Karen receives facet joint injections for her neck, she would "potentially" receive them three times a year for "as long as they work."
Our review of the record reveals that the medical testimony indicated that Karen's need for future medical treatment for her neck was speculative at best. Dr. Marks and Dr. Auer testified that Karen could "potentially" benefit from cervical injections. However, Karen failed to establish the probability, by a preponderance of the evidence, that the injections would be medically necessary to treat or resolve her neck pain. Therefore, in light of the record as a whole, we find that the trial court's conclusion that Karen was not entitled to an award for future medical expenses was reasonable.
Finally, the plaintiffs contend the trial court erred in failing to award to Calvin Jones a "reasonable amount" for loss of consortium. They argue that the amount awarded, $1,500, constitutes an abuse of discretion, and the award should be increased to at least $10,000.
La. C.C. art. 2315(B) authorizes the recovery of monetary damages for loss of consortium, service, and society by the spouse and children of an injured person. Damages for loss of consortium are general damages; the assessment of which the fact finder is given much discretion. La. C.C. art. 2324.1 ; Brammer v. Bossier Par. Sch. Bd. , 50,220 (La. App. 2 Cir. 11/25/15), 183 So. 3d 606 ; McNeill v. Landstar Ranger, Inc. , 43,362 (La. App. 2 Cir. 6/11/08), 986 So.2d 905, writ denied , 2008-1558 (La. 10/10/08), 993 So.2d 1287.
In general, a claim for loss of consortium has seven elements: (1) loss of love and affection, (2) loss of society and companionship, (3) impairment of sexual relations, (4) loss of performance of material services, (5) loss of financial support, (6) loss of aid and assistance, and (7) loss of fidelity. To be compensable, it is not necessary for a claim for loss of consortium to include damages from each type of loss. Caskey , supra ; Smith v. Escalon , 48,129 (La. App. 2 Cir. 6/26/13), 117 So.3d 576. Proof of any one of these elements is sufficient to support a damage award of loss of consortium. Caskey , supra ; Smith , supra .
During the trial, Karen and Calvin testified that they had been married 23 years. Prior to the accident, Karen did all of the cooking and household chores. With regard to loss of consortium, Karen testified as follows:
*675 [Calvin]'s got to do the vacuuming, he's got to do, you know, sweeping of the floors, he's got to do - help me make the bed in the morning, whereas these are things I was used to doing. So it's - and intimate-wise, it doesn't happen. I mean, I can't - - it just hurts[.]
Calvin testified that Karen continues to work every day and she continues to cook all of their meals. However, according to Calvin, he and Karen are no longer able to do activities they once enjoyed doing together, such as boating, attending baseball games and going to the movies. Calvin also testified that he and Karen hired a housekeeper because Karen is unable to perform household chores such as mopping and vacuuming the floors. Further, he stated that he sometimes vacuums the floors.
The evidence of record shows that because of Karen's injuries, Calvin did some additional household chores such as sweeping and vacuuming. Although, Karen made a vague reference regarding a loss "intimate-wise," Calvin did not mention their sexual relationship. Based on the evidence before us, we cannot say the trial court abused its vast discretion by awarding Calvin $1,500 for his loss of consortium claim. This assignment lacks merit.
CONCLUSION
For the foregoing reasons, we affirm the trial court's judgment. Costs of the appeal are assessed to the plaintiffs, Karen C. Jones and Calvin R. Jones.
AFFIRMED.

The settlement and motion for summary judgment are not at issue in this appeal.

Karen reported to Dr. Marks that she experienced symptoms of a concussion immediately following the accident. However, the emergency room record did not reveal such complaints. Karen testified that she received substandard medical treatment in the emergency room and she did not report her symptoms to the emergency room staff.

Karen explained her two-year delay in returning to see Dr. Marks as follows:
The main reason why is because when I complained about my back when I had my first wreck [in 2004], my employer, Coloplast, at the time, after I had the back surgery they got ahold of the fact that I could not work as well as I used to. So I did not want my employer to know that I was having difficulty. And if I had taken off to be seeing the doctors, it would have caused an issue.
In January of the year following my first back surgery [2006], my company basically put me on a 90-day plan because I could not - I did not, in the previous quarter when I had my surgery and came back, was not able to do and perform at the standards of which they wanted.
So to be honest with you, I was afraid to say anything, so I lived with it.
* * *

Calvin Jones testified that Dr. Marks performed a spinal fusion on him in the past.

Dr. Marks' deposition was viewed by the trial court during the trial.

The videotape of Dr. Auer's deposition was viewed by the trial court during the trial.

Dr. Marks' progress notes reveal that between the November visit and the December visit, Karen had tripped, fallen and fractured her right ankle.

As Dr. Marks noted in his testimony, sometimes, Karen complained of pain in her left gluteal area; at other times, she stated that the pain was in her right gluteal area.

Unlike the issue in Champagne , supra , the choice-of-law issue herein does not pertain to the interpretation of the UM insurance contract. In Champagne , supra , the Louisiana Supreme Court addressed the issue of choice-of-law for insurance contracts issued in a foreign jurisdiction. In Champagne , the plaintiff was a resident of Mississippi, his vehicle was registered in Mississippi, and the vehicle was covered by a policy of insurance obtained in Mississippi. Nonetheless, the plaintiff sought to have Louisiana law apply to the interpretation of his UM coverage because under Mississippi law, the UM coverage was reduced on a dollar by dollar basis by the amount of liability coverage available from the tortfeasor. The Supreme Court held that even though an accident occurs in Louisiana and involves a Louisiana resident, courts must conduct a choice-of-law analysis to determine which state's law applies. In applying the analysis, the Court ultimately found that Mississippi law applied to the contract of insurance issued in Mississippi.

In Haygood v. De Escabedo , 356 S.W.3d 390 (Tex. 2011), the Texas Supreme Court stated:
As a general principle, compensatory damages, like medical expenses, "are intended to make the plaintiff 'whole' for any losses resulting from the defendant's interference with the plaintiff's rights." The collateral source rule is an exception. Long a part of the common law of Texas and other jurisdictions, the rule precludes any reduction in a tortfeasor's liability because of benefits received by the plaintiff from someone else - a collateral source. Thus, for example, insurance payments to or for a plaintiff are not credited to damages awarded against the defendant. "The theory behind the collateral source rule is that a wrongdoer should not have the benefit of insurance independently procured by the injured party, and to which the wrongdoer was not privy."
* * *
The benefit of insurance to the insured is the payment of charges owed to the health care provider. An adjustment in the amount of those charges to arrive at the amount owed is a benefit to the insurer, one it obtains from the provider for itself, not for the insured. [The plaintiff] argues that the adjustment reduces the insured's liability, but the insured's liability is for payment of taxes, if a government insurer, or premiums, if a private insurer, and for any deductible. Any effect of an adjustment on such liability is at most indirect and is not measured by the amount of the adjustment. The collateral source rule reflects "the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor." To impose liability for medical expenses that a health care provider is not entitled to charge does not prevent a windfall to a tortfeasor; it creates one for a claimant[.]
* * *
[T]he common-law collateral source rule does not allow [the] recovery ... of medical expenses a health care provider is not entitled to charge.
* * *
Id. at 394-96 (internal footnotes omitted).

Because we have concluded that the trial court did not err in concluding that Karen's back condition, after January 2014, was unrelated to the October 2013 automobile accident, we will not address the argument regarding future medical expenses for Karen's back condition.