Judgment rendered March 3, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,581-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

JOHNATHAN SHIELDS                    Plaintiff-Appellant

versus

McINNIS BROTHERS                     Defendant-Appellee
CONSTRUCTION, INC. AND
TRIO ELECTRIC COMPANY,
INC. AND TRIO ELECTRIC
COMPANY OF LOUISIANA,
LLC

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 602341

Honorable Craig Marcotte, Judge

* * * * *

LYNN ESTES, JR.                      Counsel for Appellant


PETTIETTE, ARMAND, DUNKELMAN,        Counsel for Appellee,
WOODLEY, BYRD & CROMWELL, L.L.P.     McInnis Brothers
By: Donald Armand, Jr.               Construction, Inc.
    Marshall Louis Perkins


COOK, YANCEY, KING & GALLOWAY        Counsel for Appellee,
By: Jason B. Nichols                 H&W Demolition, Inc.
    James Ashby Davis

DAVENPORT, FILES & KELLY, L.L.P.      Counsel for Appellee,
By:  Mike C. Sanders                        Trio Electric Company


SHERRON PHAE DOUGLAS          Counsel for Intervenor/
Assistant City Attorney                    Appellee, City of
                                                Shreveport


LUNN, IRION, SALLEY, CARLISLE      Counsel for Appellee,
& GARDNER                             Yor-Wic Construction
By:  James A. Mijalis                      Company, Inc.

\* \* \* \* \*

Before GARRETT, BLEICH (*Pro Tempore*),
and BODDIE (*Ad Hoc*), JJ.

**GARRETT, J.**

In this personal injury suit, the plaintiffs, Johnathan Shields and Fuleasha Shields, appeal from the trial court grant of summary judgment in favor of all the defendants, McInnis Brothers Construction, Inc. ("McInnis"); Trio Electric Company, Inc. and Trio Electric Company of Louisiana, LLC ("Trio"); Yor-Wic Construction Company, Inc. ("Yor-Wic"); and H&W Demolition, Inc. ("H&W"). For the following reasons, we affirm the trial court judgment.

## FACTS

Johnathan Shields was employed by the City of Shreveport ("City") as an operator at the Lucas Wastewater Treatment Plant ("the Plant"). The facility was undergoing extensive renovations. The roofs and most of the walls of two buildings which housed digester sludge pumps had been demolished. Scaffolding had been erected over the pumps and their switches to protect them during the demolition process. Shields claimed that, at 3 a.m. on August 9, 2016, he touched the switch to Digester Pump ("DP") #2, in order to shut the pump off, and received an electrical shock. There were no witnesses to the alleged incident.

In July 2017, Shields filed suit against McInnis and Trio, alleging that the City contracted with McInnis for renovation of the Plant and McInnis subcontracted all electrical work to Trio. Shields claimed he received an "electrocution" injury and the defendants were liable for failure to follow proper engineering and electrical engineering standards; to properly maintain electrical systems; to install equipment properly; to properly ground electrical equipment; to notice and observe improper grounding and the lack thereof; to inspect, notify, and warn of defects, errors, and

deficiencies; and other acts of negligence to be proven at trial. He claimed to have permanent and disabling medical problems as a result of the incident and sought damages.

The petition was amended to add Shields's wife, Fuleasha, who asserted a loss of consortium claim. The plaintiffs also added as defendants Yor-Wic and H&W. McInnis subcontracted a large portion of the work to Yor-Wic, and Yor-Wic subcontracted the demolition work to H&W.

After extensive discovery, all the defendants filed separate motions for summary judgment. As explained below, voluminous attachments were filed with the motions.[1]

McInnis argued that none of the contractors owed a duty to Shields. The contract with the City did not require any work on the switch for DP #2, and no work was done on it by any contractor prior to Shields's complaint. McInnis further claimed it did not owe a duty to Shields because it had subcontracted all work in that area to Yor-Wic. McInnis asserted that, as a contractor, it was immune from liability under La. R.S. 9:2771, because it performed all work in accordance with the plans and specifications furnished by the City. The statute grants immunity to a contractor for destruction, deterioration, or defect in work if he follows the plans and specifications furnished to him, which he did not make or cause to be made, when the destruction, deterioration, or defect is due to fault or insufficiency of the plans or specifications. The company maintained that the plaintiffs could not sustain their burden of proof that McInnis breached any duty that created a hazardous condition or caused injury. McInnis argued that Shields had no

_____

[1] The five-volume record from the trial court contains more than 900 pages.

personal knowledge to support his claims of negligence and that he could not prove that an electrical shock actually occurred. McInnis attached to its motion copies of the contracts between the parties, and excerpts from the depositions of Shields; Carlos Ferguson, a supervisor at the Plant; Mary Williams, the Certified Chief Supervisor at the Plant; Robert Horne, Jr., on behalf of McInnis; Ryan Wicker, on behalf of Yor-Wic; Bailon Moore, on behalf of H&W; and Joey Young, representing Trio.

Yor-Wic's motion urged that it did not owe a duty to Shields, did not violate any duty to him, and was entitled to immunity under La. R.S. 9:2771. Yor-Wic pointed out that it did not do any electrical work at the Plant. It attached excerpts of the depositions of Wicker, Horne, Moore, and Young.

Trio's motion also asserted that it did not owe a duty to Shields, did not breach any duty owed, and was entitled to immunity under La. R.S. 9:2771. It attached the affidavit of its employee, Robert Wade, along with the depositions of Young, Wicker, and Horne.

H&W's motion argued that there was no evidence it was at fault in this matter. H&W did not assert immunity under La. R.S 9:2771. It attached the depositions of Wicker, Moore, Horne, Young, and excerpts from the depositions of Shields, Ferguson, and Williams.

The plaintiffs filed an opposition to the motions and attached some documents discussed below. The plaintiffs asserted that a contractor is not entitled to immunity under La. R.S. 9:2771, regarding damage to third parties, unless he had no justifiable reason to believe that adherence to the plans and specifications would create a hazardous condition. The plaintiffs contended there was no evidence that the plans were followed. They urged that the demolition of structures surrounded by water and electricity created

3

a hazardous condition.  The plaintiffs also claimed that the immunity provided by La. R.S. 9:2771 was limited by La. R.S. 9:2773 and La. R.S. 9:2775.

The defendants filed replies to the plaintiffs' opposition arguing that the documents submitted by the plaintiffs were unsworn and unverified and not in compliance with the listing in La. C.C.P. art. 966 of documents that may be considered on a motion for summary judgment.

A hearing on the motions was held on August 5, 2019.  It was clear from the arguments that the trial court had conducted an exhaustive review of the record.  The plaintiffs argued that the electrical shock was caused by a break in the metal conduit to DP #2, which was patched together "at some point" with plastic pipe.  The plaintiffs admitted they did not know when this occurred or who did it.  The trial court noted that the plaintiffs had no evidence to show that any of the defendants breached any duties owed to the plaintiffs or were negligent in any way.  Because there were no genuine issues of material fact, the trial court ruled that all the defendants were entitled to summary judgment on the facts, irrespective of La. R.S. 9:2771.  On August 22, 2019, a written judgment was rendered granting summary judgment in favor of McInnis, Trio, Yor-Wic and H&W, dismissing the claims of the plaintiffs and the City.[2]  The plaintiffs appealed.

## MOTION FOR SUMMARY JUDGMENT

On appeal, the plaintiffs argue that the documentary evidence they submitted with their opposition to the motions for summary judgment

---

[2] In the trial court, the City filed a petition of intervention to recover workers' compensation benefits paid to Shields.  The City did not appeal from the grant of summary judgment in favor of all defendants.

4

contradicts the deposition evidence submitted by the defendants and creates a genuine issue of material fact, making the grant of summary judgment inappropriate. This argument is without merit.

## Legal Principles

Appellate courts review motions for summary judgment *de novo*, using the same criteria that govern the district court's consideration of whether summary judgment is appropriate.[3] *Peironnet v. Matador Res. Co.*, 12-2292 (La. 6/28/13), 144 So. 3d 791; *Succession of Robinson*, 52,718 (La. App. 2 Cir. 6/26/19), 277 So. 3d 454, *writ denied*, 2019-01195 (La. 10/15/19), 280 So. 3d 613.

The motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant. *Schultz v. Guoth*, 10-0343 (La. 1/19/11), 57 So. 3d 1002. The procedure is favored and shall be construed to secure the just, speedy, and inexpensive determination of actions. La. C.C.P. art. 966(A)(2). A motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(A)(3); *Succession of Robinson*, *supra*.

A fact is material if it potentially ensures or precludes recovery, affects a litigant's ultimate success, or determines the outcome of the legal dispute. A genuine issue of material fact is one as to which reasonable persons could disagree; if reasonable persons could reach only one

---

[3] In their appellate brief, the plaintiffs contended that the standard of review was manifest error. During oral arguments, the plaintiffs acknowledged this was erroneous and that the appropriate standard of review is *de novo*.

conclusion, there is no need for trial on that issue and summary judgment is appropriate. *Maggio v. Parker*, 2017-1112 (La. 6/27/18), 250 So. 3d 874; *Jackson v. City of New Orleans*, 2012-2742 (La. 1/28/14), 144 So. 3d 876, *cert. denied*, 574 U.S. 869, 135 S. Ct. 197, 190 L. Ed. 2d 130 (2014); *Saldana v. Larue Trucking, LLC*, 52,589 (La. App. 2 Cir. 4/10/19), 268 So. 3d 430, *writ denied*, 2019-00994 (La. 10/1/19), 280 So. 3d 159.

In determining whether an issue is genuine, a court should not consider the merits, make credibility determinations, evaluate testimony, or weigh evidence. *Chanler v. Jamestown Ins. Co.*, 51,320 (La. App. 2 Cir. 5/17/17), 223 So. 3d 614, *writ denied*, 2017-01251 (La. 10/27/17), 228 So. 3d 1230; *Marioneaux v. Marioneaux*, 52,212 (La. App. 2 Cir. 8/15/18), 254 So. 3d 13.

The burden of proof rests with the mover. Nevertheless, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. The burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law. La. C.C.P. art. 966(D)(1); *Doerle Food Servs., L.L.C. v. River Valley Foods, L.L.C.*, 52,601 (La. App. 2 Cir. 5/22/19), 273 So. 3d 656, *writ denied*, 2019-01188 (La. 10/15/19), 280 So. 3d 602; *Collins v. Hill*, 52,457 (La. App. 2 Cir. 2/27/19), 265 So. 3d 1202.

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. La. C.C.P. art. 967(A). When a motion for summary judgment is made and supported as provided above, an adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him. La. C.C.P. art. 967(B); *Bank of Am., N.A. v. Green*, 52,044 (La. App. 2 Cir. 5/23/18), 249 So. 3d 219; *Doerle Food Servs., L.L.C. v. River Valley Foods, L.L.C.*, *supra*.

Under Louisiana's duty-risk analysis, a plaintiff in a tort suit must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care; (2) the defendant failed to conform his or her conduct to the appropriate standard of care; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) actual damages. *Christy v. McCalla*, 11-0366 (La. 12/06/11), 79 So. 3d 293; *Pinsonneault v. Merchants & Farmers Bank & Trust Co.*, 2001-2217 (La. 4/03/02), 816 So. 2d 270; *Caskey v. Merrick Const. Co., Inc.*, 46,886 (La. App. 2 Cir. 3/14/12), 86 So. 3d 186, *writ denied*, 2012-0847 (La. 6/1/12), 90 So. 3d 442.

**Discussion**

In determining whether summary judgment was properly granted in this case, we have examined the voluminous documents filed in support of

7

and in opposition to the motions. In support of their motions, the defendants offered excerpts of the depositions of Shields, Ferguson, and Williams, as well as the depositions of Horne, Wicker, Young, and Moore. Trio also offered the affidavit of one it its electricians, Robert Wade.

The plant has two separate buildings housing the four digester pumps. DP #2 and DP #4 are in the *north* buildings and DP #1 and DP #3 are in the *south* building.

Shields stated that, when the alleged incident occurred, he was working alone and drove a golf cart to the location where the switch for DP #2 was located in order to turn the pump off. He positioned the cart close to the wall. He was wearing two pairs of gloves furnished by the City. The first was a cloth glove next to the skin and the second had, at least, a rubber or latex palm. When Shields touched the switch, he claimed that the switch sparked and there was a flash. He lost consciousness and woke up on the ground, with his head against the golf cart. When he tried to use his radio, he realized his arm was hurt. He said that his entire right side was aching and felt like it was on fire.

Shields drove the golf cart to the front and reported the incident to his supervisor, Ferguson. He went into the locker room for the remainder of his shift and has not worked in the area since the accident. He said, before this incident, he never knew what it was to receive an electrical shock. He claimed that, before the accident, "they had been working on those pumps along with everything else." After the accident, Williams told him that "other parties" said the box where the switch was located was not grounded correctly. He stated that, other than that, he had no information as to what caused the shock. Shields was asked about the allegations of negligence in

8

his petition and what information he had to support those allegations. He said the fact that he got shocked and what Williams told him were the only facts he had to support his allegations. Shields said, "All I know is I got electrocuted. Other than that, I can't tell you who was working on what."

Ferguson stated that Shields came to his office at 2:57 a.m. on the date of the alleged incident and said that he got shocked when he turned DP #2 off. According to Ferguson, Shields did not say anything about being hurt at that time. Ferguson said they did not have any discussions about needing to check out the switch or not using it. There had been no prior reports of employees getting shocked when touching the switch for DP #2.

Williams said that there had not been any previous reports of shock incidents with the switch to DP #2 before Shields made his report. She was asked if she received any information from anyone to explain why Shields would have gotten shocked. She said, "Other than the water, rainwater being in the pump, no." She was asked whether anyone told her that the switch was improperly grounded before the renovation, or at the time of the of the renovation. She said, "Dawn Cook said something about the grounding after the fact." Williams said she did not reach any conclusion on her own as to the cause of the alleged incident. She stated, "I'm not electrical. I don't know. I didn't even try to come to a conclusion. I had an employee that said he got hurt, and I talked to Dawn Cook and that's what she told me. And as far as I know, the problem was taken care of and that was that." Cook was apparently connected with CDM Smith, the company managing the construction for the City. She was not deposed.

Moore, with H&W, outlined the work his company did to demolish the buildings around the pumps. He stated that the work was carried out on

9

April 12-15, 2016. The company did not receive any complaints of damage and the work was completed almost four months before Shields claimed he was injured.

Horne, McInnis's project manager for the job at the Plant, stated that McInnis was hired to demolish, rebuild and expand the pump buildings and to replace the four pumps. Scaffolding was placed around the pumps and switches before demolition began and tarps were later placed over the equipment when the City requested that. No work was originally required on the switches for the pumps. The switches and pumps were rated to be used outdoors in wet conditions. Horne was notified of this alleged incident in a telephone call from Plant personnel on August 15, 2016. Trio looked at the switch and was never able to reproduce the incident. McInnis was not able to verify that a shock actually occurred. McInnis sent a letter to Yor-Wic on September 19, 2016, which Horne termed a "CYA" letter, informing Yor-Wic of the allegations about the switch for DP #2.[4] Horne said that the letter was not an indication that the incidents actually occurred. He had no personal knowledge of the events recounted in the letter. He was merely recounting things he was told, not things that he knew or witnessed. He stated that the letter was not intended to be a summary of any investigation

---

[4] The letter from Horne to Wicker, included as an exhibit with the plaintiffs' opposition to the motions for summary judgment, stated in part:

Two incidents of City of Shreveport plant personnel being shocked at Digester Pump #2 have occurred at the Lucas Wastewater Treatment Plant. These events occurred on the weekend of 8/13/16-8/15/16 and the evening of September 7, 2016. On 9/12/16 Rajbarath Panneerselvam notified us via telephone call that the City of Shreveport will hold us responsible for any claims that arise due to these incidents. The cause of the first incident was determined to be broken conduit. This conduit was broken during the demolition of the existing building. At the time of the first shock the existing pump #2 was still in service. The demolition, rebuild and replacement of the pumps and piping at the digesters is all part of your scope of work.

10

made by McInnis. In fact, all information that he had prior to the letter showed that no one had been able to reproduce an electrical shock on the switch for DP #2.

Horne clarified the statement in the letter that the first incident was determined to have been caused by a broken conduit, essentially stating that the letter was wrong. He said that the broken conduit was in the *south* building and had nothing to do with DP #2, which was in the *north* building. He had no knowledge of any damage to the conduit in the north building. He also stated that the damage to the conduit in the south building occurred in September 2016, after this alleged incident, and the conduit was connected to a sump pump, not a digester pump.

Ryan Wicker, a project manager with Yor-Wic, stated that McInnis was the general contractor for the renovation of the Plant and subcontracted a large portion of the work to Yor-Wic. Yor-Wic did the work above ground, which largely involved replacing the pumps. McInnis was responsible for work done in a tunnel under the plant. According to their contract, no work on the pump switches was included in the scope of Yor-Wic's work. Wicker stated that the pumps and switches were designed to be used outside in wet conditions. Yor-Wic's work required the demolition of the two buildings that housed the pumps. Pumps one and three were in the *south* building and pumps two and four were in the *north* building. Yor-Wic was notified by McInnis when the conduit in the *south* pump building was damaged, but that did not affect DP #2. Yor-Wic subcontracted the demolition to H&W, which completed the work in April 2016, four months before Shields's alleged incident. DP #2 was replaced on August 10, the day after this alleged incident. The second incident where someone claimed to

11

have been shocked was found to be a complete fabrication and was not reproducible.

Wade, Trio's foreman for the job at the Plant, had been an electrician for 50 years. He gave an affidavit stating that McInnis furnished Trio with the plans and specifications for the work. Trio was not required to inspect all existing wiring in the Plant and did not do any work on the switch prior to the alleged incident. In changing out DP #2, which occurred after this alleged incident, it was observed that the wiring for the pump ran through a different conduit than the wiring for the switch. Even though the wiring for DP #2 was switched out on August 10, 2016, the same conditions of the switch existed on the date of the alleged incident as existed on August 15, 2016, when Wade examined the switch for an electrical problem. He found that the switch operated properly. He said the switch and the pump were designed to be used outdoors in wet conditions. He was asked by the City to add a ground wire to the switch. Prior to the addition of the ground wire, the switch was grounded through a mechanical ground, which was acceptable when the pump was originally installed. He said there was no break in the conduit which would have interrupted the ground. He used a voltmeter to test the switch and did not find a short or voltage back-feed. Pursuant to a change order requested by the City, Trio installed ground rods for the pumps.

Young, a vice-president with Trio, said the company disconnected the electricity for the existing pumps and reconnected it for the new pumps. The original scope of the work did not include any work to the switch for DP #2. No work of any kind was done on the switch prior to August 9, 2016. The switch was rated to be weather resistant and could be used outside in wet

conditions. There was no need to cover the switch after the roof and walls of the surrounding building were demolished. By the time Young saw the switch, Wade had put a new ground wire on it. This work was done, not because it was necessary, but because it was requested by the City. Young noted that Wade was told by Plant personnel that when they opened the switch box, there was water in it. When Wade opened it, it was dry. Wade tested the switch and could not replicate the problem which Shields claimed existed.

Young said that when employees of his company first looked at the switch, it was grounded in accordance with the requirements in effect when it was originally installed. He said that, on a lot of older projects, the conduit system was used as a ground and would create a continuous ground path back to some ground source, whether it be the pump in dirt or back to the main breaker.

Young noted that the company was informed that a second shock incident occurred, but did not know when that happened. He heard that the man who made the second complaint of being shocked was informed that a ground wire had been installed on the switch and there was no way he could have received a shock. Young understood that, at that point, the man recanted.

After the alleged incident involving Shields, Trio was asked by the City to change out the entire switch for DP #2, and it did so. Young was shown a picture of broken conduit, but it could not be determined whether it was connected to DP #2. Young was asked about whether the conduit for DP #2 was pieced together with plastic pipe. Young said that he never saw a piece of plastic connecting the two metal pieces. He said he would have

13

noticed that when he went to the plant to investigate the switch. The question at the deposition was the first time he had heard of any allegation that plastic pipe was used to patch the conduit.

Young was shown the gloves worn by Shields. Young said that the rubber on the gloves would have prevented a shock. He noted that the button on the switch was plastic, which also would have prevented a shock. He said if anything did happen, Shields would have felt nothing more than a tingle. He stated that the conditions present at the scene could not intermittently cause a shock. According to Young, water is a conductor of electricity, but a poor one. Water in the switch box could not have created enough voltage for a person to have gotten a shock. To receive a significant shock, a loose wire would be required, causing a direct short.

Young was questioned about a series of emails and correspondence from McInnis. One email from McInnis addressed a number of deficiencies at the Plant. In response, the ground wires on the pump switches were added pursuant to a change order submitted by the City. They were not an original part of the scope of the work. Young was asked about another email from McInnis on September 7, 2016, discussing damage to the pump conduit in front of the *south* digester pump building, which was some distance away and not connected to DP #2. The incident in this case involved DP #2, which was located in the *north* digester pump building. McInnis sent an email on September 8, 2016, informing Young that another City employee had made a separate complaint of being shocked.

In opposition to the motions for summary judgment, the plaintiffs submitted several documents which were discussed in the depositions relied

14

upon by the plaintiffs.[5]  The first document was an email from Horne, on

behalf of McInnis, dated September 7, 2016, regarding damage to a conduit

at the *south* building, even though it was established that this damage had no

connection with DP #2, which was located in the *north* building.  The email

was addressed to Rudy G. Zelmer, a construction manager for CDM Smith,

the company managing the construction for the City.  Young and Wicker

received copies of the email.  The plaintiffs also attached the construction

accident report dated August 18, 2016, which discussed Shields's report of

injury, the report from another employee stating he received a shock from

the switch on *DP #1* (apparently an error in the report), the allegations that

the switches were not properly weatherproofed and had been penetrated by

rainwater, and the allegations that the switches were not properly grounded

with a ground wire.[6]  The plaintiffs attached another email from Horne to

---

[5] In their reply briefs, McInnis and Yor-Wic objected, saying that the plaintiffs' documents were not admissible under La. C.C.P. art. 966, which specifies that the only documents that may be filed in support of or in opposition to the motion are pleadings, memoranda, affidavits, depositions, answers to interrogatories, certified medical records, written stipulations, and admissions.  The court may consider any documents to which no objection is made.  Any objection to a document shall be raised in a timely filed opposition or reply memorandum.  The court shall consider all objections prior to rendering judgment.  The court shall specifically state for the record or in writing which documents, if any, it held to be inadmissible or declined to consider.  La. C.C.P. art. 966(D)(2).  The trial court did not rule on the objections before rendering judgment. The objections were discussed in passing at the hearing, but McInnis noted that the documents were "in the record anyway."  The trial court considered the documents in rendering judgment in favor of the defendants.  Even though the admissibility of the documents was discussed in the appellate briefs of Yor-Wic and McInnis, neither party appealed or answered the appeal.  Therefore, the issue of whether the documents were properly considered has not been raised for review.  However, as the trial court concluded, even if the documents are considered, the defendants are still entitled to summary judgment.

[6] This document was on the letterhead of CDM Smith, and was prepared by "Dawn Cook, IMS Engineers."  Relevant portions of this document provide:

COS [City of Shreveport] Employee Johnathan Shields (Operator) stated he was in the process of turning Digester Sludge Pump #2 (DSP#2) off on 08/09/16 at 3 am when he sustained an electrical shock to his right hand; DSP#2 had existing pump and electrical wiring/conduits/switches at that time; COS Operations personnel reported seeing sparks/flame in area of DSP#1 conduits on 08/14/16; COS Employee David Shaw (EIT) reported being shocked (minor) by power button (switch) for DSP#1 on

15

Young, dated September 8, 2016, which discussed the allegations that another employee was shocked on the switch for *DP #2*. The plaintiffs then noted H&W's answers to interrogatories stating that the company finished its demolition work in April 2016. The plaintiffs attached the letter dated September 19, 2016, from Horne to Yor-Wic, quoted above in footnote 4, noting the two alleged incidents of shock injuries and stating that "The cause of the first incident [involving the plaintiff] was determined to be broken conduit. This conduit was broken during the demolition of the existing building." The plaintiffs also attached a copy of the agenda for the weekly scheduling meeting, dated September 9, 2016, on McInnis's letterhead. The first item on the agenda was the "Digester Pump Electrical Issues." There are handwritten notes on the document stating "will suggest add perm ground to digester pumps," as well as a notation about adding grounds to "pumps 1, 3, & 4."

According to the plaintiffs, these documents showed that more than one person was shocked; the ground connection was damaged by one of the four contractors while removing concrete under DP #2 and its switch; the conduit on DP #2 had a conduit replacement made of plastic pipe, which is

---

> Monday morning 08/15/16 during investigation; DSP#1 had been replaced with new pump at this time but existing electrical wiring/conduits/switches were still in place; due to demo of pump room ceiling and walls, the existing electrical conduits/wiring/switches (being used temporarily) were not adequately weatherproofed which allowed rainwater penetration; Trio Electrician also reported that no ground wire was used for grounding of pump power switches back into main circuit ground and that metal conduit was intended to function as mechanical ground, but because conduits on DSP#1 & 3 were broken, and DSP#2 conduit contained a section of plastic conduit, they did not have a continuous ground; Trio Electricians replaced/repaired conduits, added ground wire, and weatherproofed as needed for DSP#1-3[.]

The defendants contend that this document was an exhibit to the Yor-Wic deposition and contained a first sheet, omitted by the plaintiffs, which showed that the document was a draft of the accident report.

not a conductor of electricity, and therefore the DP #2 switch was not grounded. The plaintiffs admitted they did not know who made the repair with plastic pipe. They concluded that summary judgment should be denied and "trial should ensue to find the negligent culprit who left this dangerous situation for the innocent and uninformed Plaintiff to encounter."

In the trial court and on appeal, the plaintiffs argue that Shields received an electrical shock and injuries from contact with the switch for DP #2. They contend that Shields's alleged injury occurred because damage to the conduit connected to the pump, which had been repaired with plastic pipe, caused the switch to not be grounded. Although the plaintiffs urge that the documents submitted with their opposition to the motions for summary judgment conflict with the depositions submitted by the defendants, creating genuine issues of material fact as to the liability of the defendants, an examination of this record does not support that claim.

The documents submitted by the plaintiffs were considered and discussed in the depositions submitted by the defendants. Read together, the depositions explained away all statements in the plaintiffs' documents that possibly could be construed so as to create a genuine issue of material fact as to liability on the part of any of the defendants for anything Shields may have experienced when he touched the switch for DP #2 on the date of the alleged incident.

There is no showing that any of the defendants owed a duty to the plaintiffs or breached any duty. In support of their motions, the defendants showed that they were not required to examine the wiring for the switch to DP #2, and did not do any work on the switch prior to the alleged shock incident. They also showed that none of the contractors damaged the

17

conduit to DP #2. The alleged problem with the switch could not be replicated. The defendants also established that, because the pump and switch were designed to be used outdoors in wet conditions, because the switch was plastic, and because Shields was wearing two pairs of gloves at the time he claims he was shocked, it was highly improbable that the incident actually occurred.

Because the defendants provided ample support for their motions for summary judgment, the plaintiffs could not rest upon the mere allegations of their pleadings, but were required to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the defendants were not entitled to summary judgment as a matter of law.

The plaintiffs simply failed to carry that burden. The plaintiffs did not provide the depositions or affidavits of the "other parties" who said that the pump was not properly grounded. Williams said in her deposition that "Dawn Cook said something about the grounding after the fact." However, Cook was not deposed and did not supply an affidavit. Although the plaintiffs contended there was damage to the conduit for DP #2 which resulted in Shields's shock injury, they did not establish when the pipe was damaged, by whom, or who installed a piece of plastic pipe. The plaintiffs failed to establish that this alleged damage was actually on the conduit connected to DP #2. Based upon this record, there is no showing that the plaintiffs could carry their burden of proof at trial to show any negligence on the part of any of the defendants. The grant of summary judgment in favor of all the defendants was correct.

Because of its decision that the plaintiffs failed to establish a genuine issue of material fact on the merits of the case, the trial court did not

18

consider whether the immunity of La. R.S. 9:2771 applied to McInnis, Yor-Wic, and Trio, who argued its applicability.[7] We also find that consideration of the question is not necessary here. Although not asserted in an assignment of error, the plaintiffs argue in their brief that La. R.S. 9:2771 immunity does not apply here because the statute is limited by La. R.S. 9:2773 and La. R.S. 9:2775. The plaintiffs' argument is simply incorrect. A reading of these statutes shows that the provisions are not interrelated and have no applicability to the immunity statute.[8]

---

[7] The statute states:

> No contractor, including but not limited to a residential building contractor as defined in R.S. 37:2150.1(9), shall be liable for destruction or deterioration of or defects in any work constructed, or under construction, by him if he constructed, or is constructing, the work according to plans or specifications furnished to him which he did not make or cause to be made and if the destruction, deterioration, or defect was due to any fault or insufficiency of the plans or specifications. This provision shall apply regardless of whether the destruction, deterioration, or defect occurs or becomes evident prior to or after delivery of the work to the owner or prior to or after acceptance of the work by the owner. The provisions of this Section shall not be subject to waiver by the contractor.

[8] La. R.S. 23:2773 provides:

> A. It is the public policy of the state that the responsibility which may be imposed on an agent, contractor, or representative by reason of the responsibility of proprietors under Article 667 of the Louisiana Civil Code shall be limited solely to the obligation of such agent, contractor, or representative to act as the surety of such proprietor in the event the proprietor is held to be responsible to his neighbor for damage caused him and resulting from the work of such agent, contractor, or representative, and only in the event the proprietor is unable to satisfy any claim arising out of such damage. The agent, contractor, or representative who is responsible for damages, as limited by this Section, shall have a right of action against the proprietor for any damages, costs, loss or expense which he may suffer in his capacity as the surety of the proprietor.
>
> B. Nothing in this Section shall be construed to relieve a contractor of any liability which he may incur as a result of his own negligence or the improper performance of the work performed under the construction contract.
>
> C. The provisions of this Section shall apply to all construction agreements entered into after the effective date hereof and may be waived by the contractor.

19

## CONCLUSION

For the reasons stated above, we affirm the ruling of the trial court granting summary judgment in favor of the defendants, McInnis Brothers Construction, Inc.; Trio Electric Company, Inc. and Trio Electric Company of Louisiana, LLC; Yor-Wic Construction Company, Inc.; and H&W Demolition, Inc., dismissing all claims of the plaintiffs, Johnathan Shields and Fuleasha Shields.  Costs in this court are assessed to the plaintiffs.

**AFFIRMED**.

---

La. R.S. 23:2775 states, in pertinent part:

A. Any provision in a contract for the sale of equipment or machinery to be incorporated in a construction project, as hereinafter defined, which excludes liability for consequential damages is null and void.

B. (1) For the purposes of this Section the term "construction project" shall mean any residential or commercial project for the improvement, construction, modification, or repair of a fixed land based structure, or commercial project.

(2) The term "construction project" shall not include industrial or agricultural projects including but not limited to:
. . . .

(j) Public sewerage, water treatment, or pumping facility.

C. "Consequential damages" are defined as loss of revenue, production, profits, use, rental income, or cost of replacement facilities, equipment and/or product, as may be applicable.